UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

STATES OF NEW YORK, CALIFORNIA,
CONNECTICUT, MARYLAND, NEW
JERSEY, OREGON, RHODE ISLAND,
VERMONT, and WASHINGTON;
COMMONWEALTH OF MASSACHUSETTS;
and the DISTRICT OF COLUMBIA,

Plaintiffs,

v.

E. SCOTT PRUITT, as Administrator of the
United States Environmental Protection
Agency; UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; RYAN A. FISHER, as Acting
Assistant Secretary of the Army for Civil
Works; and UNITED STATES ARMY
CORPS OF ENGINEERS,

Defendants.

**COMPLAINT**

Case No. 1:18-cv-1030

---

Plaintiffs, the States of New York, California, Connecticut, Maryland, New

Jersey, Oregon, Rhode Island, Vermont, and Washington, the Commonwealth of

Massachusetts, and the District of Columbia (the States), each represented by its

Attorney General, allege as follows against defendants E. Scott Pruitt, as

Administrator of the United States Environmental Protection Agency (EPA); EPA;

Ryan A. Fisher, as Acting Assistant Secretary for the United States Army Corps of

Engineers (Army Corps); and the Army Corps (collectively, the agencies):

## INTRODUCTION

1.      In 2015, following a multi-year comment process and extensive scientific analysis, the agencies promulgated the Clean Water Rule to clarify which waters are protected by the Clean Water Act (CWA or Act), streamline and strengthen enforcement of antipollution laws, and protect the health and safety of this country's natural resources and drinking water supply.

2.      The agencies have now suspended the Clean Water Rule—without consideration of the extensive scientific record that supported it or the environmental and public health consequences of doing so—by adding a new "applicability date" that delays the rule's applicability for two years and reinstates the definition of "waters of the United States" from the 1980s (Suspension Rule).

3.      Reverting to the definition that pre-dated the 2015 Clean Water Rule is a wholesale, substantive redefinition of "waters of the United States" under the Act.  The agencies have undertaken this redefinition with inadequate public notice and opportunity for comment, insufficient record support, and outside their statutory authority, illegally suspending a rule that became effective more than two years ago.  And the agencies have codified this expansive redefinition under the guise of merely "preserving the status quo."

4.      Accordingly, the States seek a declaration that the Suspension Rule is unlawful and an order vacating it.

## NATURE OF THE ACTION

5.     On February 6, 2018, the agencies issued the Suspension Rule, effectively repealing the agencies' 2015 Clean Water Rule by suspending the applicability of the Clean Water Rule for two years and replacing it with pre-existing regulations.  *Definition of "Waters of the United States"—Addition of an Applicability Date to 2015 Clean Water Rule,* 83 Fed. Reg. 5200 (Feb. 6, 2018) (Suspension Rule).   The agencies promulgated the Suspension Rule in violation of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (APA) by failing to provide an opportunity for the States and general public to comment on the merits of either the Clean Water Rule or the preexisting regulations replacing it, by failing to consider the merits of either the Clean Water Rule or the preexisting regulations, and by failing to consider the substantive environmental and public health effects of their actions.

6.     The CWA prohibits the discharge of pollutants, including dredged or fill material, into "the waters of the United States" unless authorized by a permit issued by EPA or the Army Corps.  33 U.S.C. §§ 1311(a), 1342, 1344, 1362(6),(12), 1362(7).

7.     The Clean Water Rule, which took effect on August 28, 2015, defined "waters of the United States" to include both navigable waters and waters that impact the chemical, physical and biological integrity of navigable waters. *Clean Water Rule: Definition of "Waters of the United States,"* 80 Fed. Reg. 37,054 (June 29, 2015). The definition was intended to address ambiguities in preexisting

regulations (1980s regulations) by establishing a "clearer, more consistent, and easily implementable" definition of protected waters, thus reducing the need for burdensome, case-specific jurisdictional determinations. *Id.* at 37,054, 37,056-57.

8.      The definition of waters of the United States is of fundamental importance to achieving the Act's overarching objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. §1251(a), because it establishes which waters are protected by the Act and are therefore subject to the Act's prohibition against discharges of pollutants, including dredge and fill material, without a permit.

9.      The Clean Water Rule protected the States' environmental interests by strengthening and clarifying CWA protections of waters within the States' jurisdictions and by helping to ensure that polluted water from other states did not flow into their waters.  The Suspension Rule harms the States' waters by limiting the Act's protections and by making implementation of the Act more difficult. The Suspension Rule also imposes economic burdens and costs upon the States and harms their proprietary interests.

10.      The Clean Water Rule rests upon a massive factual record. It was developed with an extensive multi-year public outreach that elicited over one million public comments.  80 Fed. Reg. at 37,056-57. Consistent with the Act, the Clean Water Rule is based on the best peer-reviewed science and protects waters that if polluted are likely to have significant adverse impacts on the integrity of downstream waters.

11.     The Suspension Rule adds an "applicability date" of February 6, 2020 to the Clean Water Rule, thus suspending the Clean Water Rule.  *See* 83 Fed. Reg. at 5208.   It replaces the Clean Water Rule with the 1980s regulations.  *Id.* at 5201.

12.     In promulgating the Suspension Rule, the agencies have violated the APA. The agencies' promulgation of the Suspension Rule exceeds the agencies' statutory jurisdiction, authority, and limitations, and is short of statutory right (5 U.S.C. § 706(2)(C)); violates the APA's procedural requirements  (5 U.S.C. § 706(2)(D)); and is otherwise arbitrary, capricious, an abuse of discretion and not in accordance with law (5 U.S.C. § 706(2)(A)) because:

a)      neither the CWA nor the APA, 5 U.S.C. § 705, authorized the agencies to suspend the Clean Water Rule for at least two years;

b)      the agencies denied the public a meaningful opportunity to comment on the Suspension Rule by (i) instructing the public not to comment on the law and the facts justifying the Clean Water Rule or the 1980s regulations that replace it, and (ii) providing a comment period that was too short for an important and complex rule;

c)      the agencies acted arbitrarily and capriciously and without a rational basis because (i) they failed to consider whether or how the Suspension Rule would meet the Act's objective of restoring and maintaining the integrity of the Nation's waters; (ii) they failed to consider the law and facts justifying the Clean Water Rule or its replacement with the 1980s regulations; (iii) they ignored or countermanded, without reasoned explanation, key factual and scientific findings

5

that they themselves reached just a few years earlier when they promulgated the Clean Water Rule to replace the 1980s regulations; (iv) they failed to reasonably discuss or consider alternatives; and (v) they failed to articulate a rational explanation for the Suspension Rule.

## JURISDICTION AND VENUE

13.     This action raises federal questions, and the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702. The States seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. § 701 *et seq*.

14.     Venue is proper within this federal district, pursuant to 28 U.S.C. §§ 1391(b) and 1391(e), because plaintiff State of New York resides within the district and defendants reside or may be found there.

## THE PARTIES

15.     Plaintiffs are sovereign states of the United States of America, except for the District of Columbia, which is a municipal corporation.  Plaintiffs bring this action as *parens patriae* on behalf of their citizens and residents to protect public health, safety, welfare, their waters and environment, and their general economies. Each plaintiff also brings this action in its own sovereign and proprietary capacities.

16.     Defendant E. Scott Pruitt is sued in his official capacity as Administrator of EPA.

17.     Defendant EPA is the federal agency with primary regulatory authority under the CWA Act.

18.     Defendant Ryan A. Fisher is sued in his official capacity as Acting Assistant Secretary of the Army for Civil Works within the Army Corps.

19.     Defendant Army Corps has primary regulatory authority over the Act's Section 404 permit program for dredge and fill permits, codified at 33 U.S.C. § 1344.

## STATUTORY AND REGULATORY FRAMEWORK

### Suspension of a Final Regulation

20.     Federal agencies may only act in accordance with specific statutory authority granted to them by Congress.

21.     The CWA does not grant EPA or the Army Corps authority to suspend a final regulation.

### The Administrative Procedure Act

22.     Federal agencies are required to comply with the APA's rulemaking requirements.

23.     Under the APA, a federal agency must publish notice of a proposed rulemaking in the Federal Register and "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c).

24.     "[R]ule making" means "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5).

25.     The opportunity for public comment under 5 U.S.C. § 553(c) must be meaningful, which means that the agency must allow comment on the relevant issues and provide adequate time for comment.  A short comment period for an important and complex rule is insufficient.

26.     An agency may only issue a rule after "consideration of the relevant matter presented" in public comments. 5 U.S.C. §§ 553(c).

27.     An agency must publish a rule in the Federal Register "not less than 30 days before its effective date" except pursuant to certain exceptions, including good cause shown. 5 U.S.C § 553(d).

28.     The APA does not authorize an agency to delay the effective date of a rule after the effective date has passed.   *See* 5 U.S.C. § 705.

29.     The APA does not require a rule to have an "applicability date."

30.     The APA authorizes this Court to "hold unlawful and set aside agency, findings and conclusions" it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

31.     The APA also authorizes this Court to "hold unlawful and set aside agency" rules adopted "without observation of procedure required by law." 5 U.S.C. § 706(2)(D).

<u>The Clean Water Act</u>

32.     The Act's "objective . . . is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

33.    The Act's central requirement is that pollutants, including dredged and fill materials, may not be discharged from point sources into "navigable waters" without a permit.  *Id.* §§ 1311(a), 1342, 1344, 1362(12).  "Navigable waters" are defined as "the waters of the United States, including the territorial seas." *Id.* §1362(7).  The Act does not define "waters of the United States." Permits control pollution at its source, and discharges of pollutants, including dredged and fill materials, into waters of the United States are prohibited unless they are in compliance with permit requirements. *See id.* § 1311(a); S. Rep. No. 92-414 at 77 (1972) ("[I]t is essential that discharge of pollutants be controlled at the source.").

34.    Permits for the discharge of dredged and fill materials into waters of the United States are issued by the Army Corps under Section 404 of the Act, unless a state is authorized by EPA to operate this permit program for discharges within its borders.  33 U.S.C. § 1344(a), (h). Permits for the discharge of other pollutants are issued by EPA under Section 402 of the Act, unless EPA authorizes a state to operate this permit program for such discharges within its borders. 33 U.S.C. § 1342(a), (b).

35.    Before the CWA was amended in 1972 to require that point sources have permits, water pollution controls targeted the pollution in receiving water bodies without specifically regulating the pollution sources. That made it difficult for the agencies and states to take action against polluters.  Without the permit program agencies had to "work backward from an overpolluted body of water to determine which point sources are responsible and which should be abated."

*Environmental Protection Agency v. State Water Resources Control Bd.*, 426 U.S. 200, 204 (1976).

36.     The Act's permitting programs make enforcement simpler, only requiring proof that pollutants are discharged to a water of the United States from a point source in violation of a permit's terms (or without a permit).

37.     The Act also establishes minimum pollution controls that are applicable nationwide, creating a uniform "national floor" of protective measures against water pollution. 33 U.S.C.. §§ 1344(h)(1), 1370.  Under the CWA, states are free to rise above this nationwide floor by implementing their own more stringent controls.  *See id.* § 1370(1).

38.     Because many of the Nation's waters cross state boundaries, and it is difficult for downstream states to control pollution sources in upstream states, the Act's nationwide controls are crucial for protecting downstream states from pollution originating outside their borders.  Without those nationwide controls, upstream states can impose less stringent standards on point sources in their states.  Those less stringent controls would harm the environmental and proprietary interests of downstream states.  In addition, downstream states would be at a competitive disadvantage if they must impose more stringent controls than upstream states to protect the downstream states' waters and safeguard public health and welfare.

### The 1980s Regulations

39.     The agencies have defined "the waters of the United States" through regulation.

40.     In 1977, the Army Corps issued regulations defining "waters of the United States." 42 Fed. Reg. 37,144 (July 19, 1977). EPA promulgated a revised definition in 1980, 45 Fed. Reg. 85,336, 85,346 (Dec. 24, 1980), and the Army Corps promulgated the very same definition in 1982, 47 Fed. Reg. 31,794 (July 22, 1982).

41.     The 1980s regulations defined the "waters of the United States" to cover (1) waters used or susceptible of use in interstate or foreign commerce (*i.e.*, for transportation by vessels), commonly referred to as navigable-in-fact or "traditionally navigable" waters, (2) interstate waters, (3) the territorial seas, and (4) impoundments of jurisdictional waters, as well as other waters having a nexus with interstate commerce.

42.     The regulatory definition remained essentially unchanged until 2015, when the agencies promulgated the Clean Water Rule.

43.     Stakeholders have long criticized the 1980s regulations, as applied by the agencies, for their lack of clarity and consistency. *See* 82 Fed. Reg. 34,899, 34,901; 80 Fed. Reg. at 37,054. The regulations resulted in many complex case-by-case determinations by the agencies throughout the country, and led to confusing and inconsistent interpretations by the agencies and the federal courts as to which waters are "waters of the United States," and therefore within the Act's protections.

44.     The Supreme Court interpreted "waters of the United States" in *Rapanos v. United States*, 547 U.S. 715 (2006) (*Rapanos*), where a property owner challenged the Army Corps' determination that he improperly filled wetlands without a permit.  Justice Scalia, writing for a plurality of the Court, defined waters covered by the statute to include relatively permanent, standing or continuously flowing bodies of water connected to traditional navigable waters (*i.e.*, navigable-in-fact waters), as well as wetlands with a continuous surface connection to traditional navigable waters. 547 U.S. at 739. Justice Kennedy's concurring opinion set forth the "significant nexus" standard: if a wetland or water significantly affects the integrity of other waters "more readily understood as 'navigable,'" it is protected by the Act. *Id.* at 780.

45.     After *Rapanos*, the lower federal courts continued to grapple with how to apply the 1980s regulations.

### THE CLEAN WATER RULE

46.     To remedy the ambiguity of the 1980s regulations, the agencies promulgated the Clean Water Rule, which defined "waters of the United States" under the Act based on "the text of the statute, Supreme Court decisions, the best available peer-reviewed science, public input, and the agencies' technical expertise and experience."  80 Fed. Reg. at 37,055.  The Clean Water Rule became effective on August 28, 2015.  *Id.* at 37,054.

47.     When the agencies promulgated the Clean Water Rule, they found that the 1980s regulations:

did not provide the public or agency staff with the kind of
information needed to ensure timely, consistent, and
predictable jurisdictional determinations. Many waters
are currently subject to case specific jurisdictional
analysis to determine whether a "significant nexus"
exists, and this time and resource intensive process can
result in inconsistent interpretation of CWA jurisdiction
and perpetuate ambiguity over where the CWA applies.
As a result of the ambiguity that exists under current
regulations and practice following these recent [court]
decisions, almost all waters and wetlands across the
country theoretically could be subject to a case-specific
jurisdictional determination.

*Id.* at 37,056.

48.     The agencies explained that:

The purposes of the [Clean Water Rule] are to ensure
protection of our nation's aquatic resources and make the
process of identifying 'waters of the United States' less
complicated and more efficient. The rule achieves these
goals by increasing CWA program transparency,
predictability, and consistency . . . with increased
certainty and less litigation.

79 Fed. Reg. at 22,190.

49.     The Clean Water Rule establishes clear categories of waters within the

CWA's jurisdiction as well as categories that are excluded from the CWA's

jurisdiction, thereby reducing the need for case-specific jurisdictional

determinations. 80 Fed. Reg. at 37,056.

50.     The Clean Water Rule employs the "significant nexus" standard,

consistent with Justice Kennedy's concurrence in *Rapanos*.

51.     The agencies performed rigorous scientific review in crafting the Clean

Water Rule to define jurisdictional waters as those waters that have a "significant

nexus" with the integrity of downstream navigable-in-fact waters. *See id.* at 37,057. In particular, they relied on a comprehensive report prepared by EPA's Office of Research and Development, entitled "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" (Science Report),[1] which reviewed more than 1200 peer-reviewed publications. The agencies also relied on EPA's Science Advisory Board's independent review of the Science Report. *Id.*

52.    In developing the Clean Water Rule, the agencies also prepared an economic analysis of their proposed action.   *See id.* at 37,101.

53.    In developing the Clean Water Rule, the agencies clarified and tightened the definition of waters of the United States to cover waters with significant effects on the integrity of downstream waters and to exclude others lacking such effects.

54.    The Clean Water Rule, reflecting longstanding consensus views of the agencies and stakeholders, retained several categories of protected waters from the 1980s regulations: (1) waters used or susceptible of use in interstate or foreign commerce (*i.e.*, for transportation by vessels), commonly referred to as navigable-in-fact or "traditionally navigable" waters, (2) interstate waters, (3) the territorial seas, and (4) impoundments of jurisdictional waters.

---

[1] U.S. EPA, *Connectivity of Streams and Wetlands to Downstream Waters:  A Review and Synthesis of the Scientific Evidence (Final Report)*, EPA/600/R-14/475F (Washington, D.C. 2015), *available at* https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=296414.

55.     The agencies found that many waters not specifically listed in the 1980s regulations have a significant nexus to downstream waters, including headwater stream tributaries and certain waters in floodplains. In reliance on their scientific findings, the agencies expressly included such waters within the Clean Water Rule's protections.

56.     The agencies explained that "wetlands and open waters in floodplains of streams and rivers and in riparian areas . . . have a strong influence on downstream waters," 79 Fed. Reg. at 22,196, and "[t]he body of literature documenting connectivity and downstream effects was most abundant for riparian/floodplain wetlands," Technical Support Document for the Clean Water Rule; Definition of Waters of the United States, May 27, 2015, Docket Id. No. EPA-HQ-OW-2011-0880, at 104.

57.     In applying the significant nexus test, the Clean Water Rule also supplied precise definitions missing from the 1980s regulations for "tributaries" and "adjacent" waters protected by the Act, and definitions of waters not protected, thereby reducing the need for complex case-by-case administrative decisions and judicial review. The Clean Water Rule protected "adjacent waters," including those found within 100 feet of certain other covered waters or within specified portions of 100-year floodplains.

58.     States, trade associations, environmental organizations, and others challenged the Clean Water Rule in several federal district courts and federal courts of appeals.  Before becoming EPA Administrator, defendant E. Scott Pruitt, as

Oklahoma Attorney General, brought challenges to the Clean Water Rule, claiming that it exceeded the agencies' statutory and constitutional authority.

59.     The petitions in circuit courts were consolidated in the Sixth Circuit, which issued a nationwide stay of the Clean Water Rule pending resolution of the merits. *Ohio v. United States Army Corps of Eng'rs* (*In re EPA & DOD Final Rule*), 803 F.3d 804 (6th Cir. 2015). In a ruling *sub nom. Murray Energy Corp. v. United States Dep't of Def.*, 817 F.3d 261 (6th Cir. 2016), the Sixth Circuit subsequently determined that it had jurisdiction over the petitions rather than the district courts.

60.     The district court actions challenging the Clean Water Rule were dismissed or stayed pending resolution of proceedings in the Sixth Circuit and Supreme Court.

61.     On January 22, 2018, the Supreme Court held unanimously that the Sixth Circuit lacked jurisdiction over the petitions for review challenging the Clean Water Rule and remanded the case to that court to dismiss the petitions for lack of jurisdiction. *Nat'l Ass'n of Manufacturers v. Department of Defense*, No. 16-299, 2018 U.S. LEXIS 761, at *31-*32  (Jan. 22, 2018).

## THE PROPOSED REPEAL RULE

62.     In July 2017, the agencies published a proposed rule to rescind the definition of "waters of the United States" contained in the 2015 Clean Water Rule, and replace it with the pre-existing definition contained in the 1980s regulations. *See Proposed Rule, Definition of "Waters of the United States" – Recodification of Pre-Existing Rules*, 82 Fed. Reg. 34,899 (July 27, 2017) (the Proposed Repeal Rule).

The agencies characterized this proposal as the first step in a two-step process, with the second step to be a subsequent notice-and-comment rulemaking to re-evaluate the substantive definition of "waters of the United States." *Id.* at 34,901. The agencies called this proposal an "interim measure pending substantive rulemaking," and indicated that they were not seeking public comments concerning the pre-2015 definition of "waters of the United States, *id.* at 34,903 (agencies "are not soliciting comment on the specific content of those longstanding regulations") or "issues related to the 2015 [Clean Water] Rule," *id.* They also made clear that the Proposed Repeal Rule was not based on a substantive review of the definition of waters of the United States. *Id.*

63.     The agencies stated that they were proposing to rescind the 2015 definition because, in the event that the Supreme Court ruled that the Sixth Circuit did not have original jurisdiction to review the Clean Water Rule, the Sixth Circuit's nationwide stay of the Clean Water Rule would be dissolved, leading to "inconsistencies, uncertainty, and confusion." *Id.* at 34,902.  The agencies indicated that the Clean Water Rule would still be preliminarily enjoined in thirteen states pursuant to an order of the district court for North Dakota, but would apply in the rest of the nation. *Id.* at 34,902-03.  They also expressed concern that other district court actions "would likely be reactivated." *Id.* at 34,903.

64.     The agencies invited comments for the Proposed Repeal Rule through August 28, 2017. *Id.* at 34,899. They subsequently extended the comment period through September 27, 2017. *See "Definition of 'Waters of the United States'—*

*Recodification of Pre-Existing Rules; Extension of Comment Period,*" 82 Fed. Reg. 39,712 (Aug. 22, 2017).

65.     The agencies received over 680,000 comments on the Proposed Repeal Rule. They have not yet issued a final rule as part of the Proposed Repeal Rule rulemaking process.

## THE SUSPENSION RULE

66.     After the comment period closed on the Proposed Repeal Rule, and without further action on that proposal, the agencies published a different proposal to modify the 2015 Clean Water Rule—this time, by proposing to add an "applicability date" to the 2015 Clean Water Rule of "two years from the date of final action on this proposal." *Proposed Rule, Definition of "Waters of the United States" – Addition of an Applicability Date to 2015 Clean Water Rule*, 82 Fed. Reg. at 55,542 (Nov. 22, 2017) (the Proposed Suspension Rule).

67.     An earlier version of the Proposed Suspension Rule announced by the agencies sought to delay the effective date of the Clean Water Rule—which was August 28, 2015—to a date two years from finalizing the proposed rule.  The published version of the Proposed Suspension Rule instead characterized the delay as an "addition of an applicability date" to the Clean Water Rule.

68.     The agencies did not withdraw the Proposed Repeal Rule upon publication of the Proposed Suspension Rule; rather, they stated that the Proposed Repeal Rule "remains under active consideration." *Id*. at 55,543.

69.     As with the Proposed Repeal Rule, the agencies characterized the Proposed Suspension Rule as an interim measure prior to their anticipated "Step Two" rulemaking for developing a new substantive definition of the "waters of the United States." *Id*. at 55,542.

70.     Like the Proposed Repeal Rule, the Proposed Suspension Rule also stated that the 1980s regulations would replace the Clean Water Rule during the suspension of the Clean Water Rule.  *Id*. at 55,542-43.

71.     The rationale for the Proposed Suspension Rule was similar to the rationale for the Proposed Repeal Rule. The agencies expressed concern that, if the Supreme Court held that the Sixth Circuit lacks original jurisdiction over challenges to the Clean Water Rule, the temporary nationwide stay of that rule "would expire, leading to possible inconsistencies, uncertainty, and confusion as to the regulatory regime that could be in effect pending substantive rulemaking." *Id*. at 55,543. They expressed concern about the district courts having control over whether the Clean Water Rule is stayed: "control over which regulatory definition of 'waters of the United States' is in effect while the agencies engage in deliberations on the ultimate regulation could remain outside of the agencies." *Id*. at 55,544. They also justified adding an applicability date on the ground that the Clean Water Rule did not have one. *Id*. at 55,543.

72.     As with the Proposed Repeal Rule, the Proposed Suspension Rule did not include a substantive analysis of the objectives of the Clean Water Act, the law and facts justifying the Clean Water Rule, the merits of the 1980s regulations, or

the potential environmental and public health effects and foregone benefits of repealing the Clean Water Rule for two years.

73.    The Proposed Suspension Rule also ignored or countermanded key factual and scientific findings reached by the agencies when they promulgated the Clean Water Rule without any explanation for doing so.

74.    Also like the Proposed Repeal Rule, the Proposed Suspension Rule made clear that the agencies were not seeking substantive comment on either the Clean Water Rule or the 1980s regulations that would replace it. Instead, the agencies stated that they were deferring substantive comments until their "Step Two" rulemaking. *Id.* at 55,544-45.

75.    The agencies provided only a twenty-one day comment period (which included the Thanksgiving holiday) for the Proposed Suspension Rule, a much shorter period than the sixty-day comment period provided for the Proposed Repeal Rule.

76.    The agencies justified that brief comment period on the ground that the Suspension Rule is a "narrowly targeted and focused interim rule" and "the request for comment is on such a narrow topic." *Id.* at 55,544.

77.    During the short 21-day comment period, the agencies received 4,600 comments as compared to 680,000 comments on the Proposed Repeal Rule.

78.    On December 13, 2017, many of the States filed comments with the agencies on the Proposed Suspension Rule, objecting to the proposal and requesting that the agencies withdraw it.

79.     On February 6, 2018, the agencies published the Suspension Rule in essentially the same form as it was proposed.  83 Fed. Reg. 5200.  The Suspension Rule adds an applicability date of February 6, 2020 to the Clean Water Rule.  *Id.* at 5208.

80.     In issuing the final Suspension Rule, the agencies relied principally on the rationale articulated in the Proposed Suspension Rule.  They indicated that the lifting of the Sixth Circuit's nationwide stay of the Clean Water Rule as a result of the Supreme Court's January 22 ruling is "likely to lead to uncertainty and confusion as to the regulatory regime applicable, and to inconsistencies between the regulatory regimes applicable in different States pending further rulemaking by the agencies." *Id.* at 5202.

81.     The final Suspension Rule took effect upon publication in the Federal Register on February 6, 2018.  The agencies assert that the impending lifting of the Sixth Circuit stay constitutes "good cause" to dispense with the requirement under 5 U.S.C § 553(d) that a final rule may take effect no earlier than 30 days after its publication.  *Id.* at 5203.

82.     The Suspension Rule results in a wholesale substantive replacement of the Clean Water Rule, rendering the Clean Water Rule ineffective for two years.

## THE SUSPENSION RULE HARMS THE STATES

83.     The Suspension Rule irreparably harms the States' waters and the States' environmental, economic, and proprietary interests.

84.     As the agencies themselves recognized when they adopted the Clean
Water Rule, the 1980s regulations employed a limited, unclear, and difficult-to-
administer definition of protected waters.  As a result, the 1980s regulations do not
provide the protection to the States' water quality that is provided by the Clean
Water Rule.

85.     The States are situated along the shores of the Atlantic and Pacific
Oceans, the Chesapeake Bay and its tributaries, the Great Lakes, and Lake
Champlain, and are downstream from and/or otherwise hydrologically connected
with many of the Nation's waters. The States have authority to control water
pollution generated by sources within their borders but are also impacted by water
pollution from sources outside their borders over which they lack jurisdiction. The
States rely on the Act and its uniform nationwide floor of pollution controls as the
primary mechanisms for protecting them from the effects of out-of-state pollution.
The Suspension Rule injures the States' waters by replacing the Clean Water Rule,
which protected them from pollution occurring in upstream states, with the
inadequate and ambiguous 1980s regulations.

86.     The States rely on the Army Corps to operate the Act's Section 404
permitting program that regulates dredging and filling of waters within their
borders. The less protective definition of waters of the United States under the
1980s regulations means there will be more dredging and filling of waters within
the States without the protections of the CWA's Section 404 permitting program, to
the detriment of the physical, chemical and biological integrity of the States' waters.

22

87.     The Suspension Rule puts the States at an unfair economic disadvantage in competition with other states. To mitigate out-of-state pollution, under the 1980s regulations the States face having to impose disproportionately strict controls on pollution generated within their borders, thereby raising the costs to States and the costs of doing business in them.

88.     The Suspension Rule impairs the States' proprietary interests. The States own, operate, finance, or manage property within their borders, including lands, roads, bridges, universities, office buildings, drinking water systems, sewage and stormwater treatment or conveyance systems, and other infrastructure and improvements. The Suspension Rule results in inadequate and ineffective protection of waters under the Act, and is likely to cause damage to State properties as well as increase costs of operating and managing them.

89.     The requested relief, if granted, will redress the injuries to the States' interests caused by the Suspension Rule.

### FIRST CLAIM FOR RELIEF

(Administrative Procedure Act – Not in
Accordance With Law and Beyond
Statutory Authority)

90.     The States incorporate by reference in this claim the allegations in all preceding paragraphs of the complaint.

91.     Under the APA, courts must "compel agency action unlawfully withheld or unreasonably delayed," and "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

23

with law," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

92.    The Clean Water Act does not give the agencies authority to suspend the Clean Water Rule.

93.    The APA, 5 U.S.C. § 705, did not give the agencies authority to suspend the Clean Water Rule after its effective date passed.

94.    The agencies' promulgation of the Suspension Rule is in excess of statutory jurisdiction, authority, or limitations, or is short of statutory right.

95.    The Suspension Rule is unlawful and must be set aside. 5 U.S.C. § 706(2)(C).

**SECOND CLAIM FOR RELIEF**

(Administrative Procedure Act –
Without Observance of Procedure
Required by Law)

96.    The States incorporate by reference in this claim the allegations in all preceding paragraphs of the complaint.

97.    Under the APA, a federal agency must publish notice of a proposed rulemaking in the Federal Register and "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" 5 U.S.C. §§ 553(b), (c).  A federal agency must provide this opportunity for public comment when it seeks to formulate, amend, or repeal a rule. *See* 5 U.S.C. § 551(5).

98.     The Suspension Rule effectively repeals the 2015 Clean Water Rule by reinstating the pre-2015 regulatory definitions for a two-year period.

99.     The opportunity for public comment under 5 U.S.C. § 553(c) must be meaningful, which means that the agency must allow comment on the relevant issues and provide adequate time for comment. A short comment period for an important and complex rule is insufficient.

100.    When an agency suspends a rule, the law and facts justifying the rule and the effects of doing so are relevant issues.

101.    When an agency proposes to replace a rule with prior regulations, the effectiveness and conformance to law of the prior regulations is a relevant issue.

102.    The agencies failed to provide a meaningful opportunity for public comment on the Suspension Rule by instructing the public not to comment substantively on any matters regarding the definition of waters of the United States, including issues related to the 1980s regulations and the Clean Water Rule.

103.    The definition of "waters of the United States" is a complex matter of great importance to the public.

104.    The agencies failed to provide a meaningful opportunity for public comment on the Suspension Rule by allowing only a short, ill-timed comment period.

105.    A final rule must be published in the Federal Register not less than thirty days before its effective date except pursuant to certain exceptions, including good cause. 5 U.S.C § 553(d).

106.   The agencies did not have good cause to make the Suspension Rule effective upon publication in the Federal Register.

107.   The Suspension Rule is unlawful and must be set aside because it is without observance of procedure required by law and not in accordance with law. 5 U.S.C. §§ 553(b), (c); 706(2)(A), (2)(D).

### THIRD CLAIM FOR RELIEF

(Administrative Procedure Act – Arbitrary and Capricious Action)

108.   The States incorporate by reference in this claim the allegations in all preceding paragraphs of the complaint.

109.   Promulgation of a regulation is arbitrary and capricious if the agency fails to consider relevant issues or fails to articulate a rational explanation for the rule.

110.   Where an agency proposes to suspend a rule and replace it with prior regulations, the agency must consider the objectives of the statute under which the rule was promulgated, the law and facts justifying the proposal, and the effectiveness of the prior regulations.

111.   When an agency proposes to suspend a rule, the agency may not ignore or countermand its earlier factual and scientific findings without a reasoned explanation for doing so.

112.   When the agencies promulgated the Suspension Rule, they did not consider whether or how the Suspension Rule would meet the Act's objective of restoring and maintaining the integrity of the Nation's waters.

26

113.    When the agencies promulgated the Suspension Rule, they did not consider the law and facts justifying the Clean Water Rule or the 1980s regulations that would replace it.

114.    When the agencies promulgated the Suspension Rule, they ignored or countermanded key factual and scientific findings reached by them when they promulgated the Clean Water Rule without a reasoned explanation for doing so.

115.    When the agencies promulgated the Suspension Rule, they did not reasonably consider or discuss alternatives.

116.    When the agencies promulgated the Suspension Rule, they failed to articulate a rational explanation for it.

117.    Because, among other things, the agencies failed to consider all of the relevant issues and offer a rational explanation for the Suspension Rule, the Suspension Rule is unlawful and must be set aside because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, the States respectfully request that the Court issue a judgment and order:

a)      holding the Suspension Rule unlawful, setting it aside, and vacating it;

b)      declaring that the Suspension Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law;

      c)     awarding the States their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. §2412(d); and

      d)     awarding the States such additional and further relief as the Court may deem just, proper, and necessary.

DATED: February 6, 2018                Respectfully submitted,

                                  FOR THE STATE OF NEW YORK

                                  ERIC T. SCHNEIDERMAN
                                  Attorney General

By:_____
           PHILIP BEIN (PB1742)
           TIMOTHY HOFFMAN
           MONICA WAGNER
           *Assistant Attorneys General*
           Environmental Protection Bureau
           Office of the Attorney General
           The Capitol
           Albany, NY 12224
           (518) 776-2413
           Philip.Bein@ag.ny.gov

FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General
SARAH E. MORRISON
Supervising Deputy Attorney General

By: _Tatiana K. Gaur_
    Tatiana K. Gaur*
    *Deputy Attorney General*
    *Attorneys for Plaintiff*
    *State of California, by and through*
    *Xavier Becerra, Attorney General*
    Environment Section
    300 South Spring Street
    Los Angeles, CA  90013
    (213) 269-6329
    Tatiana.Gaur@doj.ca.gov

FOR THE STATE OF CONNECTICUT

GEORGE JEPSEN
Attorney General

By: _Robert Snook_
    Matthew I. Levine (ML2346)
    Robert Snook (RS3666)
    *Assistant Attorneys General*
    Office of the Attorney General
    PO Box 120, 55 Elm Street
    Hartford, CT 06141-0120
    (860) 808-5250
    Matthew.Levine@ct.gov
    Robert.Snook@ct.gov

FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General
ROBYN BENDER
Deputy Attorney General
Public Advocacy Group
CATHERINE A. JACKSON
Chief, Public Integrity Section

By: _/s/ Brian Caldwell_
    Brian R. Caldwell*
    *Assistant Attorney General*
    Office of the Attorney General
    of the District of Columbia
    441 Fourth Street N.W., Ste # 600-S
    Washington, D.C. 20001
    Tel: (202) 727-6211
    brian.caldwell@dc.gov

FOR THE STATE OF MARYLAND

BRIAN FROSH
Attorney General

By: _/s/ Leah J. Tulin_
    Leah J. Tulin*
    *Assistant Attorney General*
    Office of the Attorney General
    200 Saint Paul Place, 20th Floor
    Baltimore, Maryland 21202
    (410) 576-6962
    ltulin@oag.state.md.us

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
Attorney General

By:_____
    Seth Schofield*
    *Assistant Attorney General*
    Nora Chorover*
    *Special Assistant Attorney General*
    Energy and Environment Bureau
    One Ashburton Place, 18th Floor
    Boston, MA 02108
    (617) 963-2428
    Seth.Schofield@state.ma.us
    Nora.Chorover@state.ma.us


FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL

By _____
    Paul Garrahan*
    *Attorney-in-Charge,*
    Natural Resources Section
    Oregon Department of Justice
    1162 Court St. NE
    Salem, OR 97301-4096
    (503) 947-4593
    paul.garrahan@doj.state.or.us


FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General

By:     /s/ Gwen Farley_____
    GWEN FARLEY, Esq. (GP0434)
    *Deputy Attorney General*
    David C. Apy
    *Assistant Attorney General in Charge*
    Environmental Practice Group
    Division of Law, Director's Complex
    R.J. Hughes Justice Complex
    25 Market Street, P.O. Box 112
    Trenton, N.J. 08625
    (609) 292-8567
    David.Apy@law.njoag.gov


FOR THE STATE OF RHODE ISLAND

PETER KILMARTIN
Attorney General

By:     /s/ Gregory S. Schultz_____
    Gregory S. Schultz*
    *Special Assistant Attorney General*
    Rhode Island Department of Attorney
    General
    150 South Main Street
    Providence, RI 02903
    (401) 274-4400
    gSchultz@riag.ri.gov

FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General

By: _____
Benjamin D. Battles (BB5387)
*Solicitor General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5944
benjamin.battles@vermont.gov

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General

By:___/s/ Ronald L. Lavigne_____
Ronald L. Lavigne*
*Senior Counsel*
2425 Bristol Court SW, 2nd Fl.
Olympia, WA 98504
(305) 586-6751
RonaldL@ATG.WA.GOV

*  Not yet admitted to the Bar of this Court