**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK, *et al.*,        :

           *Plaintiffs*,        :

           v.        :

E. SCOTT PRUITT, *et al.*,        :         Case No. 1:18-cv-1030 (JPO)

           *Defendants*,        :

           and        :

AMERICAN FARM BUREAU        :
FEDERATION, *et al.*,        :

           *Intervenors-Defendants.*        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NATURAL RESOURCES DEFENSE        :
COUNCIL, INC., and NATIONAL WILDLIFE        :
FEDERATION,        :

           *Plaintiffs*,        :

           v.        :

ENVIRONMENTAL PROTECTION AGENCY,        :         Case No. 1:18-cv-1048 (JPO)
*et al.*,        :

           *Defendants*,        :

           and        :

AMERICAN FARM BUREAU        :
FEDERATION, *et al.*,        :

           *Intervenors-Defendants.*        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**INTERVENORS-DEFENDANTS' BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT
OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Dated: June 28, 2018

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

Introduction & Summary of Argument ............................................................................ 1

Statement ......................................................................................................................... 2

    A.  The WOTUS Rule ............................................................................................... 2

    B.  The nationwide stay and preliminary injunctions of the WOTUS Rule .................. 6

    C.  The Applicability Date Rule ................................................................................ 7

Argument ......................................................................................................................... 8

  I.  The Applicability Date Rule is lawful ................................................................ 9

  II.  The WOTUS Rule is unlawful ........................................................................... 10

    A.  The WOTUS Rule violates the plain text of the CWA, the relevant
        Supreme Court decisions, and the Constitution ........................................... 10

        1.  The WOTUS Rule reads the word "navigable" out of the CWA ................ 11

        2.  The WOTUS Rule's definition of "tributaries" is unlawful .................... 14

        3.  The WOTUS Rule's definition of "adjacent" is unlawful .................... 16

        4.  The WOTUS Rule is unconstitutionally vague ................................... 18

        5.  The WOTUS Rule violates the Commerce Clause ............................. 21

    B.  The WOTUS Rule was promulgated in violation of the law ....................... 22

        1.  EPA's advocacy campaigns were unlawful ....................................... 23

        2.  The agencies failed to comply with the Regulatory Flexibility Act ....... 25

  III.  Vacatur of the Applicability Date Rule would be inequitable ........................ 27

    A.  The alleged procedural defects in the Applicability Date Rule can be
        cured on remand ........................................................................................ 28

    B.  Vacatur of the Applicability Date Rule would be extremely disruptive,
        while declining to vacate would appropriately maintain the status quo ....... 29

Conclusion ....................................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ........................................................................27, 28

*Am. Farm Bureau Fed'n v. EPA*,
   No. 3:15-cv-165 (S.D. Tex. Feb. 7, 2018) .........................................................8, 30

*Am. Iron & Steel Inst. v. EPA*,
   568 F.2d 284 (3d Cir. 1977)......................................................................................27

*Ass'n of Cleveland Fire Fighters v. City of Cleveland*,
   502 F.3d 545 (6th Cir. 2007) ...................................................................................18

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
   781 F.3d 1271 (11th Cir. 2015) .....................................................................27, 29, 30

*Cal. Cmtys. Against Toxins v. EPA*,
   688 F.3d 989 (9th Cir. 2012) ...................................................................................31

*Cent. & S. W. Servs., Inc. v. EPA*,
   220 F.3d 683 (5th Cir. 2000) ...................................................................................27

*Cent. Me. Power Co. v. Fed. Energy Regulatory Comm'n*,
   252 F.3d 34 (1st Cir. 2001)......................................................................................27

*In re Clean Water Rule*,
   No. 15-3751 (6th Cir. Nov. 1, 2016).......................................................................30

*Dismas Charities, Inc. v. DOJ*,
   401 F.3d 666 (6th Cir. 2005) ...................................................................................23

*In re EPA & Dep't. of Def. Final Rule*,
   803 F.3d 804 (6th Cir. 2015) ...............................................................................6, 29

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)...................................................................................................9

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012)..................................................................................................18

*Georgia v. Pruitt*,
   2018 WL 2766877 (S.D. Ga. 2018).....................................................................7, 29

*Georgia v. Pruitt*,
   No. 2:15-cv-79 (S.D. Ga. June 8, 2018) ...................................................................8

*Guertin v. United States*,
    743 F.3d 382 (2d Cir. 2014) ................................................................................................33

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ..............................................................................................27

*Iowa League of Cities v. EPA*,
    711 F.3d 844 (2013) ............................................................................................................25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*,
    463 U.S. 29 (1983) ..............................................................................................................26

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
    138 S. Ct. 617 (2018) ............................................................................................................1

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ............................................................................................................21

*Nat'l Org. of Veterans Advocates, Inc., v. Sec'y of Veterans Affairs*,
    260 F.3d 1365 (Fed. Cir. 2001) ..........................................................................................27

*Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin.*,
    919 F.2d 1148 (6th Cir. 1990) ............................................................................................26

*North Dakota v. EPA*,
    127 F. Supp. 3d 1047 (D.N.D. 2015) ...................................................................................6

*NRDC v. EPA*,
    808 F.3d 556 (2d Cir. 2015) ...............................................................................................27

*Rapanos v. United States*,
    547 U.S. 715 (2006) ..................................................................................................*passim*

*S.F. Baykeeper v. Cargill Salt Div.*,
    481 F.3d 700 (9th Cir. 2007) ..............................................................................................17

*Shands Jacksonville Med. Ctr. v. Burwell*,
    139 F. Supp. 3d 240 (D.D.C. 2015) ..............................................................................27, 28

*Sharon Steel Corp. v. EPA*,
    597 F.2d 377 (3d Cir. 1979) ...............................................................................................27

*Small Refiner Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ...........................................................................................23

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*,
    531 U.S. 159 (2001) ...........................................................................................3, 11, 16

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ...................................................................27, 29

*United States v. Lopez*,
   514 U.S. 549 (1995) ...........................................................................................22

*United States v. Morrison*,
   529 U.S. 598 (2000) ...........................................................................................21

*United States v. Riverside Bayview Homes, Inc.*,
   474 U.S. 121 (1985) .............................................................................2, 16, 17

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
   259 F.2d 921 (D.C. Cir. 1958) ......................................................................29

**Statutes and Regulations**

5 U.S.C. § 603(a) ...........................................................................................................25

5 U.S.C. § 706(2)(D) ....................................................................................................25

33 U.S.C. § 1251(a) ........................................................................................................2

33 U.S.C. § 1251(b) ......................................................................................................22

33 U.S.C. § 1362(7) .............................................................................................2, 11, 13

33 C.F.R. 328.3(a) ...........................................................................................................4

33 C.F.R. 328.3(a)(2) .....................................................................................................13

33 C.F.R. 328.3(a)(6) .....................................................................................................16

33 C.F.R. 328.3(a)(7) .......................................................................................................5

33 C.F.R. 328.3(b) ............................................................................................................5

33 C.F.R. 328.3(b)(4)(vi) ..............................................................................................21

33 C.F.R. 328.3(b)(4)(vii) .............................................................................................20

33 C.F.R. 328.3(c)(1) .........................................................................................4, 16, 18

 33 C.F.R. 328.3(c)(2)(ii) ...............................................................................................17

33 C.F.R. 328.3(c)(3).............................................................*passim*33 C.F.R. 328.3(c)(5)       4, 5, 19

33 C.F.R. 328.3(c)(6) .....................................................................................................18

39 Fed. Reg. 12,115 (Apr. 3, 1974) ..............................................................................2

42 Fed. Reg. 37,122 (July 19, 1977) .............................................................. 2

73 Fed. Reg. 31,372 (June 2, 2008) ............................................................... 9

74 Fed. Reg. 18,132 (Apr. 21, 2009) ............................................................. 9

74 Fed. Reg. 48,153 (Sept. 22, 2009) ............................................................ 9

75 Fed. Reg. 16,012 (Mar. 31, 2010) ............................................................. 9

79 Fed. Reg. 22,188 (Apr. 21, 2014) ........................................................... 25

80 Fed. Reg. 37,054 (June 29, 2015) ..................................................... *passim*

82 Fed. Reg. 34,899 (July 27, 2017) .............................................................. 7

82 Fed. Reg. 55,542 (Nov. 22, 2017) .................................................... 7, 8, 10

83 Fed. Reg. 5,200 (Feb. 6, 2018) ............................................................. 8, 9

Appropriations Act of 2014,
    Pub. L. No. 113-76, 128 Stat. 5 ........................................................... 23

Consolidated and Furthering Continuing Appropriations Act, Pub. L. No. 113-
    235, 128 Stat. 2130 (2014) ................................................................... 23

Pub. L. No. 87-88, 75 Stat. 204 (1961) ......................................................... 13

Water Pollution Control Act, 62 Stat. 1155 (1948) ....................................... 13

**Other Authorities**

B-326944, 2015 WL 8618591 (Comp. Gen. Dec. 14, 2015) ....................... 24, 25

B-223098, 1986 WL 64325 (Comp. Gen. Oct. 10, 1986) ............................... 24

B-305368, 2005 WL 2416671 (Comp. Gen. Sept. 30, 2005) ....................... 23, 24

EPA, *2008 Rapanos Guidance and Related Documents*,
    perma.cc/6ZPF-PPME ...................................... 26OMB, *Circular A-4*, perma.cc/Q335-NPYA      26

Staff of S. Comm. on Env't & Pub. Works, 114th Cong., *Expansion of
    Jurisdiction Claimed Under the Clean Water Act* (2016), perma.cc/W6U3-
    583Y ..................................................................................................... 21

U.S. Army Corps of Eng'rs, *Regulatory Guidance Letter No. 05-05*
    (Dec. 7, 2005) ...................................................................................... 18

U.S. Army Corps of Eng'rs, *Survey of OHWM Indicator Distribution Patterns
    Across Arid West Landscapes* (2013) ................................................... 16

## INTRODUCTION & SUMMARY OF ARGUMENT

When the WOTUS Rule was first promulgated in June 2015, it was the subject of dozens of legal attacks from all sides—from States, environmental groups, and business and industry groups. Although those lawsuits have been stalled for much of the interim by a dispute over jurisdiction (*see Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018)), three courts have weighed in on the merits of the WOTUS Rule at preliminary stages, and each has expressed grave concerns about the legality of the WOTUS Rule and the procedures that led to its promulgation. Each has also recognized that allowing the WOTUS Rule to come into effect would inflict serious, irreparable harms on the regulated public. Not a single court anywhere in the country has expressed a word of faith in the rule's validity.

The Sixth Circuit's nationwide stay dissolved after the Supreme Court held that the court of appeals lacked jurisdiction over the challenges to the WOTUS Rule. But preliminary injunctions issued by district courts in North Dakota and Georgia remain in effect, covering 24 States.

Against this background, the Court should not vacate the Applicability Date Rule, even if it finds that the rule is unlawful. First and foremost, we agree with the agencies that the Applicability Date Rule is lawful and should be upheld in its entirely. But if the Court disagrees, any relief it might order will necessarily be limited because the WOTUS Rule cannot come into effect within the 24 States covered by the North Dakota and Georgia injunctions—and with good reason, because the WOTUS Rule itself violates the Clean Water Act (CWA), the APA, and the Constitution. Thus, an order vacating the Applicability Date Rule would be deeply disruptive to the national economy: A legally suspect regulation of immense practical importance would come into effect in a patchwork of States only, even as the agencies responsible for its enforcement work toward its replacement.

In circumstances like these, the appropriate course, if the Court concludes that the Applicability Date Rule is flawed, would be to remand *without* vacatur. The determination whether or not to vacate an unlawful regulation falls within the Court's broad, equitable discretion. For all the reasons that the Sixth Circuit exercised its equitable discretion to enter a nationwide stay of the

WOTUS Rule in 2015, this Court should exercise its equitable discretion to decline to vacate the Applicability Date Rule if it finds the rule legally deficient. Indeed, federal courts throughout the country frequently exercise their discretion to leave regulations in place during remand in circumstances like these, where vacatur would be highly disruptive.

## STATEMENT

### A.    The WOTUS Rule

The CWA establishes multiple programs that, together, are designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Two such programs regulates the "discharge of any pollutant." *Id.* § 1311(a). The discharge of a pollutant is defined as "any addition of any pollutant to navigable waters from any point source" without a permit. *Id.* §§ 1311(a), 1362(12)(A). The Act in turn defines "navigable waters" to mean "the waters of the United States, including the territorial seas." *Id.* § 1362(7). The meaning of "waters of the United States" thus defines the agencies' regulatory jurisdiction under the CWA.

In 1974 and 1977, the U.S. Army Corps of Engineers issued initial regulations defining "waters of the United States." *See* 39 Fed. Reg. 12,115, 12,119 (Apr. 3, 1974); 42 Fed. Reg. 37,122, 37,144 (July 19, 1977). The agencies' interpretation of their own regulations continued to expand over the next few decades, even as the text remained the same. The Supreme Court confronted those increasingly aggressive interpretations in a series of decisions beginning in 1985.

In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), the Court held that Congress intended the CWA "to regulate at least *some* waters that would not be deemed 'navigable'" and that it is "a permissible interpretation of the Act" to conclude that "a wetland that *actually abuts on* a navigable waterway" falls within the "definition of 'waters of the United States.'" *Id.* at 133, 135 (emphasis added). Following *Riverside Bayview*, the agencies "adopted increasingly broad interpretations" of their regulations, asserting jurisdiction over an ever-growing set of features bearing little or no relation to traditional navigable waters. *Rapanos v. United States*, 547 U.S. 715, 725 (2006) (plurality). One of those interpretations—the Migratory Bird Rule—was struck down in

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) (*SWANCC*). There, the Supreme Court held that, while *Riverside Bayview* turned on "the significant nexus" between "wetlands and [the] 'navigable waters'" they abut, the Migratory Bird Rule asserted jurisdiction over isolated ponds bearing no connection to navigable waters. *Id.* at 167. That approach impermissibly read the term "navigable" out of the statute, even though navigability was "what Congress had in mind as its authority for enacting the CWA." *Id.* at 172.

Most recently, in *Rapanos*, the Court addressed sites containing "sometimes-saturated soil conditions," located twenty miles from "[t]he nearest body of navigable water." 547 U.S. at 720-21. Justice Scalia, writing for a four-Justice plurality, held that "waters of the United States" include "only relatively permanent, standing or flowing bodies of water" and not "channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id.* at 732, 739. Justice Kennedy, concurring in the judgment, expressed support for a "significant nexus" test but categorically rejected the idea that "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it" would satisfy his conception of a "significant nexus." *Id.* at 781.

It was against this background that the agencies issued a wholesale reinterpretation of "waters of the United States" in 2015. *See* 80 Fed. Reg. 37,054 (June 29, 2015) (the "WOTUS Rule"). The WOTUS Rule purports to "make the process of identifying waters protected under the CWA easier to understand, more predictable, and consistent with the law and peer-reviewed science, while protecting the streams and wetlands that form the foundation of our nation's water resources." *Id.* at 37,055. It distinguishes between three categories of features: those that are "jurisdictional by rule," those that are jurisdictional based on a case-specific analysis, and those that are never jurisdictional. *Id.* at 37,058.

***Features jurisdictional by rule.*** The WOTUS Rule identifies six features that are "jurisdictional by rule": (**1**) waters used or susceptible to use in interstate or foreign commerce, (**2**) interstate waters, (**3**) territorial seas, (**4**) impoundments of any "waters of the United States," (**5**) tributaries to a

(1)-(3) feature, and **(6)** waters that are "adjacent" to a (1)-(5) feature. 33 C.F.R. 328.3(a); *see* 80 Fed. Reg. at 37,075 (tributaries and adjacent waters are categorically jurisdictional). The Rule and its preamble further define certain operative terms:

- "Interstate waters" are those that cross state borders, "even if they are not navigable" and "do not connect to [navigable] waters." 80 Fed. Reg. at 37,074.

- A covered "tributary" is a feature that flows "directly or through another water" to a (1)-(3) feature. 33 C.F.R. 328.3(c)(3). To count as a jurisdictional water, the tributary ***first*** must "contribute flow" directly or through any other water—such as ditches or wetlands—to a (1)-(3) feature, and ***second*** must be "characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark" (OHWM). *Id.* A tributary can be natural, man-altered, or man-made, and does not lose its status as a tributary if, for any length, there are one or more breaks (such as pipes, dams, debris fields, or underground segments), so long as a bed and banks and an OHWM can be identified upstream of the break.

- An "adjacent water" is any feature bordering, contiguous to, or "neighboring" a (1)-(5) feature. 33 C.F.R. 328.3(c)(1). "Neighboring" waters are waters any part of which is located

  - within 100 feet of the OHWM of any (1)-(5) feature;

  - within the 100-year floodplain of any (1)-(5) feature, and not more than 1,500 feet from the OHWM of such water; or

  - within 1,500 feet of the high tide line of a (1)-(3) feature or within 1,500 feet of the OHWM of the Great Lakes.

*Features jurisdictional by case-specific analysis.* The WOTUS Rule identifies two categories of features that are jurisdictional if they are "found after a case-specific analysis to have a significant nexus" to certain jurisdictional waters. 80 Fed. Reg. at 37,058. As a baseline matter, the Rule defines the term "significant nexus" to mean that "a water, including wetlands, either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, or biological integrity" of a (1)-(3) feature. 33 C.F.R. 328.3(c)(5). The Rule states, "[f]or an effect to be significant, it must be more than speculative or insubstantial." *Id.*

The Rule describes the significant-nexus analysis as a three-step process: "First, the region for the significant nexus analysis must be identified—under the rule, it is the watershed which drains to the nearest traditional navigable water, interstate water or territorial sea." 80 Fed. Reg. at 37,091. "[S]econd, any similarly situated waters must be identified—under the rule, that is waters that

4

function alike and are sufficiently close to function together in affecting downstream waters." *Id.* "[T]hird, the waters are evaluated individually or in combination with any identified similarly situated waters . . . to determine if they significantly impact the chemical, physical or biological integrity of" jurisdictional waters. *Id.*

The WOTUS Rule sets out a list of "functions" to be considered in determining whether a water "significantly affects" the integrity of another water. 33 C.F.R. 328.3(c)(5). Those functions (only one of which need be affected) include "[r]etention and attenuation of flood waters," "[c]ontribution of flow," and "[p]rovision of life cycle dependent aquatic habitat." *Id*.

Two categories of "waters" are subject to this case-by-case significant nexus analysis. The first includes several features that are categorically presumed to be "similarly situated": non-adjacent prairie potholes, Carolina and Delmarva bays, pocosins, Western vernal pools in California, and Texas coastal prairie wetlands. 33 C.F.R. 328.3(a)(7). Those water features are not further defined.

In the second category, the Rule specifies two features that are subject to significant-nexus analysis on an individual, case-by-case basis: those any part of which is "located within the 100-year floodplain" of any (1)-(3) feature or "within 4,000 feet of the high tide line or ordinary high water mark" of any (1)-(5) feature. 80 Fed. Reg. at 37,087.

***Features that are not jurisdictional.*** Finally, the WOTUS Rule enumerates certain features that are categorically non-jurisdictional. They include "swimming pools"; "[s]mall ornamental waters"; "prior converted cropland"; "waste treatment systems"; small subsets of ditches that do not flow to a (1)-(3) feature; ditches with ephemeral or intermittent flow that do not drain wetlands, relocate a tributary, or excavate a tributary; "farm and stock watering ponds"; "settling basins"; "[w]ater-filled depressions . . . incidental to mining or construction activity"; "[p]uddles"; "subsurface drainage systems"; and "[w]astewater recycling structures." 33 C.F.R. 328.3(b). Definitions are not provided for any excluded features. And in many instances, the features only qualify for an exclusion when they were created in or occur in "dry land" (an undefined term) or meet other vague criteria. 33 C.F.R. 328.3(b).

**B.     The nationwide stay and preliminary injunctions of the WOTUS Rule**

Dozens of lawsuits were filed in the district courts and courts of appeals all throughout the country by States, the regulated community, and environmental NGOs. Three courts have now entered preliminary relief against enforcement of the WOTUS Rule.

According to the U.S. Court of Appeals for the Sixth Circuit, the WOTUS Rule is procedurally "suspect," and "it is far from clear" that its substantive provisions can be squared with even the most generous reading of the prevailing Supreme Court precedents. *In re EPA & Dep't. of Def. Final Rule*, 803 F.3d 804, 807 (6th Cir. 2015). Acknowledging "the pervasive nationwide impact of the new Rule on state and federal regulation of the nation's waters" and the risk of injury "visited nationwide on governmental bodies, state and federal, as well as private parties," the Sixth Circuit concluded that "the sheer breadth of the ripple effects caused by the Rule's definitional changes counsels strongly in favor of maintaining the status quo for the time being." *Id*. at 806, 808. The Sixth Circuit thus enjoined the agencies from enforcing the WOTUS Rule nationwide. *Id.* at 808-09.

Before the Sixth Circuit entered its stay of the WOTUS Rule in August 2015, the U.S. District Court for the District of North Dakota had similarly held that the challengers to the WOTUS Rule were "likely to succeed on the merits of their claim that the EPA has violated its grant of authority in its promulgation of the Rule." *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1055 (D.N.D. 2015). Indeed, that court found that the WOTUS Rule suffered from numerous "fatal defect[s]," including that is inconsistent with any plausible reading of Supreme Court precedent; it is arbitrary and capricious; and the agencies failed to seek additional public comment after making major, unforeseeable changes to the version of the WOTUS Rule. *See id.* at 1055-58. The court thus granted the preliminary injunction within the geographic limits of Alaska, Arizona, Arkansas, Colorado, Idaho, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, South Dakota, and Wyoming. *Id*. at 1051 n.1, 1059-60.

More recently, the U.S. District Court for the Southern District of Georgia agreed that the challengers there "overwhelmingly" demonstrated a substantial likelihood of success on the merits

that the WOTUS Rule violates both the CWA and APA. *Georgia v. Pruitt*, 2018 WL 2766877, at *9 (S.D. Ga. 2018). According to that court, the WOTUS Rule is "plague[d]" by the "same fatal defect" that doomed prior EPA regulations because it reaches drains, ditches, and streams "remote from any navigable-in-fact" water. *Id.* at *4-*5 (quoting *Rapanos v. United States*, 547 U.S. 715, 781 (2006) (Kennedy, J., concurring in the judgment)); *id.* at *5 (the Rule is unlawful because it asserts jurisdiction over "remote and intermittent waters" lacking a "nexus with any navigable-in-fact waters"). The court held further that the rule is procedurally defective because the certain aspects of the final rule are not "logical outgrowth[s]" of the proposed rule, and thus an additional comment period was required. *Id.* The court thus enjoined the Rule's enforcement within the territorial limits of Alabama, Florida, Georgia, Indiana, Kansas, North Carolina, South Carolina, Utah, West Virginia, Wisconsin, and Kentucky.

## C.     The Applicability Date Rule

While the challenges to the WOTUS Rule were ongoing, but before the Supreme Court's decision on jurisdiction, the agencies published a notice of rulemaking in the *Federal Register*, proposing to repeal and replace the WOTUS Rule in a "comprehensive, two-step process" process. *See* 82 Fed. Reg. 34,899, 34,899 (July 27, 2017). The first step of this process—what we refer to as the "Repeal Rule"—would "rescind" the WOTUS Rule, restoring the status quo ante by regulation. *Id.* "In a second step," the government "will conduct a substantive re-evaluation of the definition of 'waters of the United States.'" *Id.*

The Repeal Rule was published on July 27, 2017, and the comment period ended two months later, on September 27, 2017. The agencies received thousands of comments, many of which were lengthy and substantive. The agencies have not yet issued a final Repeal Rule.

In light of the delay in the final Repeal Rule, and anticipating that the Supreme Court would reverse the Sixth Circuit's jurisdictional holding and dissolve the Sixth Circuit's nationwide stay, the agencies set out "to maintain the status quo" while they continued to consider comments on the Repeal Rule and work on the substance of a replacement rule. 82 Fed. Reg. 55,542, 55,542 (Nov. 22,

2017). The agencies thus proposed to amend the WOTUS Rule with "an applicability date" to provide "continuity and regulatory certainty for regulated entities, the States and Tribes, agency staff, and the public while the agencies continue to work to consider possible revisions." *Id.*

A notice of rulemaking for the Applicability Date Rule was published on November 22, 2017 (82 Fed. Reg. at 55,542), and the final rule was signed by the EPA Administrator on January 31, 2017 and published in the *Federal Register* on February 6, 2018. 83 Fed. Reg. 5,200 (Feb. 6, 2018). Various states and environmental organizations filed lawsuits challenging the Applicability Date Rule in the District of South Carolina, the Western District of Washington, and this Court.

Meanwhile, the Business Intervenors' suit in the Southern District of Texas was reopened following the Supreme Court's decision on jurisdiction. Because the Sixth Circuit's nationwide stay had expired, the Business Intervenors filed a motion for a nationwide preliminary injunction against the WOTUS Rule in that case. See Mot. for Prelim. Inj., *Am. Farm Bureau Fed'n v. EPA,* No. 3:15-cv-165 (Dkt. No. 61) (S.D. Tex. Feb. 7, 2018). The motion remains pending.

At the same time, the states litigating in the Southern District of Georgia renewed their motion for a preliminary injunction, and the court recently granted the motion. See Order, *Georgia v. Pruitt*, No. 2:15-cv-79 (Dkt. 174) (S.D. Ga. June 8, 2018). With the North Dakota and Georgia injunctions put together, the WOTUS Rule is now enjoined in 24 States. Should the WOTUS Rule take effect, it will thus subject the national economy—including the multistate operation of many of the Business Intervenors' members—to a patchwork regulatory regime.

## ARGUMENT

The government has aptly explained why the Applicability Date Rule is lawful in substance and was promulgated consistent with the requirements of the APA. We summarize and adopt those arguments but do not repeat them at any length. Instead, we focus on the very real harms that would befall the regulated public if this Court were to invalidate that Applicability Date Rule, allowing the 2015 WOTUS Rule to come into effect in the 26 states not currently protected by the North Dakota or Georgia preliminary injunctions. In the event the Court finds merit in plaintiffs' challenge to the

Applicability Date Rule, the Court should exercise its broad equitable discretion to remand without vacating the rule.

**I.     THE APPLICABILITY DATE RULE IS LAWFUL**

As the agencies explain at length, the Applicability Date Rule is entirely lawful: (1) It is permissible under the relevant statutory text, (2) it is consistent with the lawful and very sensible reasons given for its promulgation, and (3) it was promulgated following notice and comment as required by the APA. The Court may not second-guess the agencies' policy judgment.

1.   To begin with, the Applicability Date Rule is a reasonable exercise of the agencies' authority as the implementers, expositors, and enforcers of the Clean Water Act. Agencies "need not demonstrate to a court's satisfaction that the reasons for [a] new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). That is the case here. In promulgating the rule, the agencies reasonably concluded that they will be able to implement the CWA with greater consistency and predictability if application of the WOTUS Rule is postponed. *See* 83 Fed. Reg. at 5202 ("Addition of an applicability date to the [WOTUS] Rule will result in additional clarity and predictability and will ensure the application of a consistent interpretation and definition of 'waters of the United States' nationwide."); *id.* ("Having different regulatory regimes in effect throughout the country would be complicated and inefficient for both the public and the agencies."). Agencies routinely delay compliance and effective dates through notice-and-comment rulemaking to facilitate administrative reconsideration of the underlying rules.[1] That is just what they did here, and reasonably so.

---

[1]     *E.g.*, 75 Fed. Reg. 16,012 (Mar. 31, 2010) (staying fugitive emissions requirements for 18 months while they were reconsidered in a separate rulemaking); 74 Fed. Reg. 48,153 (Sept. 22, 2009) (staying particulate matter "grandfathering" provision for nine months so EPA could consider repealing the provision); 74 Fed. Reg. 18,132 (Apr. 21, 2009) (delaying "applicability date" of Department of Labor financial reporting regulations by six months); 73 Fed. Reg. 31,372 (June 2, 2008) (extending stay of Clean Air Act standards of performance for chemical manufacturers and petroleum refineries).

2.   The Applicability Date Rule is not arbitrary and capricious. Arguing to the contrary, plaintiffs assert that, before delaying applicability of the WOTUS Rule (at least in the 26 States in which it would come into effect), the agencies were required to reconsider the merits of the WOTUS Rule and that the rulemaking process has otherwise injected confusion into the status of the law. That is no more than a request for the Court to substitute its judgment for that of the agencies. In fact, the agencies were well within their discretion to conclude that WOTUS Rule should not be allowed to come into effect in a patchwork of States across the country regardless of its merits.

3.   The Applicability Date Rule was also promulgated in compliance with the APA. The agencies' notice of proposed rulemaking provided a full notice of the proposed agency action, explaining what the agencies proposed to do and why. The notice identified the uncertainty and inconsistency generated by litigation and the agencies' own reconsideration process and sensibly limited its request for comment to those issues. 82 Fed. Reg. at 55,544. And the agencies are now considering a repeal and replacement of the WOTUS Rule, through which the plaintiffs and public will have adequate opportunity to comment on the merits of the WOTUS Rule. The agencies were not required to remove the 2015 WOTUS Rule from the Code of Federal Regulations and restore the status quo ante, because the Applicability Date Rule does not repeal the WOTUS Rule.

## II.   THE WOTUS RULE IS UNLAWFUL

In contrast with the Applicability Date Rule itself, the rule that it amends—the 2015 WOTUS Rule—is manifestly *un*lawful. For this reason, the Applicability Date Rule should not be vacated.

### A.   The WOTUS Rule violates the plain text of the CWA, the relevant Supreme Court decisions, and the Constitution

The WOTUS Rule asserts jurisdiction over vast tracts of the United States, including count-less miles of man-made ditches and municipal stormwater systems, dry desert washes and arroyos in the arid West, "tributaries" from which water has long since disappeared and that are invisible to the naked eye, ponds on never-mapped 100-year floodplains, and virtually all land in Alaska and the water-rich Southeast. Many of these land and water features bear little or no relation to the tradi-

tional definition of navigable waters that Congress had in mind when it enacted the CWA. Whatever leeway the Act may give the agencies to regulate "navigable waters" (33 U.S.C. § 1362(7)), the statutory text is not limitless and "does not authorize this 'Land is Waters' approach to federal jurisdiction." *Rapanos*, 547 U.S. at 734 (2006) (plurality).

### 1.  The WOTUS Rule reads the word "navigable" out of the CWA

As the Supreme Court explained in *SWANCC*, the phrase "navigable waters" demonstrates "what Congress had in mind as its authority for enacting the CWA": its "commerce power over navigation" and therefore "over waters that were or had been navigable in fact or which could reasonably be so made." 531 U.S. at 172; *id.* at 168 n.3. In Justice Kennedy's concurrence from *Rapanos*—upon which the WOTUS Rule is ostensibly based—Justice Kennedy agreed that "the word 'navigable'" must "be given some importance." *Rapanos*, 547 U.S. at 778-79.

The WOTUS Rule ignores this admonition. If allowed to come into effect, it would allow the agencies to assert federal regulatory jurisdiction over desiccated ditches (as "tributaries") and any isolated water features that happen to be nearby (as waters with a "significant nexus"). For example:



**Figure 1:** The red lines likely constitute an "ordinary high water mark," and the feature depicted is likely to be a "navigable water" under the 2015 Rule. Am. Petroleum Inst. Comments 129, ID-15115.



**Figure 2:** Dade City Canal in Florida is not currently a water of the United States but would likely be deemed a "tributary" under the 2015 Rule. Fla. Stormwater Ass'n Comments 10, ID-7965.



**Figure 3:** This feature was deemed to be a "water of the United States" in 2014 after the Corps concluded that it exhibits an ordinary high water mark. AFBF Comments, App. A at 31, ID-18005.



**Figure 4:** Typical ephemeral arid washes, likely to be deemed waters
of the United States under the Rule. Freeport-McMoRan Comment 3, at 5, ID-14135.

As a matter of plain meaning, treating features like these as "tributaries" to "navigable waters"—and treating barely damp, isolated "wetlands" nearly a mile away as likewise "waters of the United States" because they are located within 4,000 feet of such "tributaries"—is impermissible.

The Rule's coverage of "all interstate waters" (33 C.F.R. 328.3(a)(2)) likewise ignores the word "navigable" (replacing it with the word "interstate") and ignores Congress's choice to *remove* the term "interstate waters" from the Act. *Compare* Water Pollution Control Act, ch. 758, 62 Stat. 1155, 1156 (1948) ("interstate"), *with* Pub. L. No. 87-88, 75 Stat. 204, 208 (1961) ("interstate or navigable"), *with* 33 U.S.C. § 1362(7) ("navigable"). The agencies purport to assert jurisdiction over all interstate water features, even when they "are not [traditional] navigable [waters]" and "do not connect to such waters." 80 Fed. Reg. at 37,074. An interstate water need not be navigable—an intermittent trickle or isolated pond is enough, so long as it crosses a state line.

The agencies thus claim jurisdiction over features that are not navigable, cannot be made navigable, have no nexus ("significant" or otherwise) to a navigable water or commerce, are not

13

adjacent to, and do not contribute flow to, a navigable water, simply because the feature "flow[s] across, or form[s] a part of, state boundaries." 80 Fed. Reg. at 37,074. And this overreach is compounded by the Rule's treatment of all "interstate waters" as if they were traditional navigable waters. As a result, any trickle that crosses a state line can be the starting point for the assertion of jurisdiction over "tributaries" or "adjacent" wetlands.

<blockquote>2.     The WOTUS Rule's definition of "tributaries" is unlawful</blockquote>

Several other aspects of the Rule are irreconcilable with Supreme Court precedent, scientific evidence, and (quite often) simple logic.

**a.**   The Rule defines "tributary" to include any feature contributing any flow to a traditional navigable water or interstate feature, "either directly or through another water," and "characterized by the presence of physical indicators of a bed and banks and an ordinary high water mark." 33 C.F.R. 328.3(c)(3). Because flow may be "intermittent[] or ephemeral" (80 Fed. Reg. at 37,076), jurisdiction under the WOTUS Rule extends to minor creek beds, municipal stormwater systems, ephemeral drainages, and dry desert washes that are dry for months, years, or even decades at a time, as long as they exhibit a bed, banks, and "ordinary high water mark," or OHWM. A feature may qualify despite passing "through any number of [non-jurisdictional] downstream waters" or natural or man-made physical interruptions (*e.g.*, culverts, dams, debris piles, or underground features) *of any length*, so long as a bed, banks, and OHWM can be identified upstream of the break. *Id*; 33 C.F.R. 328.3(c)(3). And the agencies need not use current facts; they may use historical information alone. *See, e.g.*, 80 Fed. Reg. at 37,081, 37,098.

The Rule defines OHWM to mean "that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas." 80 Fed. Reg. at 37,106. That is the same definition that Justice Kennedy criticized in *Rapanos* as too uncertain and attenuated to serve as the "determinative measure" for identifying waters of the United

States. 547 U.S. at 781. Because an OHWM is an uncertain indicator of "volume and regularity of flow," it brings within the agencies jurisdiction "remote" features with only "minor" connections to navigable waters—features that "in many cases" are "little more related to navigable-in-fact waters than were the isolated ponds held to fall beyond the Act's scope in *SWANCC*." *Id*. at 781-82. The definition's reach is thus vast, covering countless miles of previously unregulated features. And the definition is categorical, sweeping in many isolated, often dry land features regardless whether their "effects on water quality are speculative or insubstantial." *Id.* at 780. By treating all tributaries as categorically jurisdictional—even ones "carrying only minor water volumes toward" a "remote" navigable water (*id.* at 788, 781)—the Rule is inconsistent with Justice Kennedy's "significant nexus" approach.

   **b.**   For similar reasons, the rule's definition of "tributary" is inconsistent with the scientific evidence. The crux of that definition is the presence of a bed, banks, and OHWM. The underlying premise is that an "OHWM forms due to some regularity of flow and does not occur due to extraordinary events." Technical Support Document 239, ID-20869. When an OHWM is present, the reasoning goes, a water feature with relatively constant and significant water flow must also be present. But that premise is demonstrably false.

   Nowhere is that more apparent than in the arid West, where erosional features with beds, banks, and OHWMs often reflect one-time extreme water events, and are not reliable indicators of regular flow. *See* Ariz. Mining Ass'n Comments 7-11, ID-13951. In the desert, rainfall occurs infrequently, and sandy, lightly-vegetated soils are highly erodible. Thus washes, arroyos, and other erosional features often reflect physical indicators of a bed, banks, and OHWM, even if they were formed by a long-past and short-lived flood event, and the topography has persisted for years or even decades without again experiencing flow. *See* Barrick Gold Comments 15-16, ID-16914. Because arid systems lack regular flow, the channels do not "heal" or return to an equilibrium state, as they do in wet, humid climates. Freeport-McMoRan Technical Comments 7.

   The Corps' experience bears this out; their studies have found "no direct correlation" bet-

ween the location of OHWM indicators and future water flow in arid regions. *See* Ariz. Mining Ass'n Comments 10-11 (quoting U.S. Army Corps of Eng'rs, *Distribution of Ordinary High Water Mark (OHWM) Indicators and Their Reliability* 14 (2006)). In fact, "OHWM indicators are distributed randomly throughout the [arid] landscape and are not related to specific channel characteristics." *Id.* at 11 (quoting U.S. Army Corps of Eng'rs, *Survey of OHWM Indicator Distribution Patterns Across Arid West Landscapes* 17 (2013)). Needless to say, "randomly" distributed indicators cannot provide a rational basis for a blanket "significant nexus" finding.

### 3. The WOTUS Rule's definition of "adjacent" is unlawful

The rule's categorical approach to "adjacent" waters (33 C.F.R. 328.3(a)(6)) runs into similar problems. The rule defines "adjacent" as "bordering, contiguous, or neighboring." *Id.* at 328.3(c)(1). The term "neighboring" is defined to include, among other things, (i) waters within 100 feet of the OHWM of a navigable water or tributary and (ii) waters within the 100-year floodplain of such a water and within 1,500 feet of its OHWM. *Id.* at 328.3(c)(2). This definition is insupportable for four reasons.

**First,** the Court in *Riverside Bayview* described "wetlands adjacent to [jurisdictional] bodies of water" as wetlands "adjoining" and "actually abut[ting] on" a traditional "navigable waterway." 474 U.S. at 135 & n.9. Jurisdictional adjacent wetlands thus are those "inseparably bound up with the 'waters' of the United States" and not meaningfully distinguishable from them. *Id.* at 134-35 & n.9. For the same reason, the Court in *SWANCC* rejected the agencies' assertion of jurisdiction over *isolated* non-navigable waters "that [we]re *not* adjacent to open water" and thus not "inseparably bound up" with "navigable waters." 531 U.S. at 167-68, 171.

**Second,** by asserting jurisdiction based on adjacency not only to traditional navigable waters, but to any tributary, the Rule violates Justice Kennedy's *Rapanos* concurrence. Justice Kennedy rejected the idea that a wetland's mere adjacency to a *tributary* could be "the determinative measure" of whether it was "likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood." 547 U.S. at 781. In Justice Kennedy's view, "mere

adjacency to a tributary of this sort is insufficient." *Id.* at 786. Yet the WOTUS Rule doubles down on precisely this disfavored approach. It categorically asserts jurisdiction over "waters" (many of which are dry more often than wet) based on their "adjacency" to "tributaries" "however remote and insubstantial" (*id.* at 779-80), including ephemeral drains, ditches, and streams remote from navigable waters.

*Third,* the Rule improperly relies on adjacency to assert jurisdiction not only over "wet-lands," but all other "waters." The Supreme Court has never approved such a sweeping approach. *See Riverside Bayview*, 474 U.S. at 139; *Rapanos*, 547 U.S. at 742 (plurality). According to the *Rapanos* plurality, non-wetland "waters"—especially those separated from traditional navigable waters by physical barriers or significant distances—"do not implicate the boundary-drawing problem" that justified deference to the agency's approach to adjacency in *Riverside Bayview.* 547 U.S. at 742. For this reason, courts have rejected past attempts to assert "adjacency" jurisdiction over non-wetlands. *E.g.*, *S.F. Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 708 (9th Cir. 2007).

*Fourth*, the Rule improperly defines "adjacency" based on "the 100-year floodplain" (33 C.F.R. 328.3(c)(2)(ii)), which is the region whose risk of flooding in any given year is 1 percent. Such infrequent contact with jurisdictional waters flouts the "*continuous* surface connection" required by the *Rapanos* plurality. 547 U.S. at 742 (emphasis added). And under Justice Kennedy's test, a water that is "connected to [a] navigable water by flooding, on average, once every 100 years" (*Rapanos*, 547 U.S. at 728 (plurality)) cannot be said to "significantly affect the chemical, physical, and biological integrity of [the] other covered water[]." *Id.* at 780 (Kennedy, J.). At most, such a water would have an "insubstantial" "effect[] on water quality" that "fall[s] outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Id.* Within any given floodplain, moreover, the Rule applies unexplained distance criteria. 33 C.F.R. 328.3(c)(2)(ii). As officials in the Corps acknowledged, longstanding agency guidance previously held that "it is not appropriate to determine significant nexus based solely on any specific threshold of distance." Moyer Memo 2, ID-20882.

4.    *The WOTUS Rule is unconstitutionally vague*

The 2015 WOTUS Rule is unconstitutionally vague. "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The first concern is "to ensure fair notice to the citizenry" (*Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007)), so regulated individuals and entities "know what is required of them [and] may act accordingly." *Fox Television*, 567 U.S. at 253. The second concern is "to provide standards for enforcement" (*Fire Fighters*, 502 F.3d at 551), "so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television*, 567 U.S. at 253. The WOTUS Rule offends both of these concerns.

***Ordinary high water mark.*** Take first the concept of an "ordinary high water mark" (33 C.F.R. 328.3(c)(6))—the crux of a "tributary" (*id.* § 328.3(c)(3)) and the starting point for marking off the applicable distances for "adjacent" and "neighboring" waters (*id.* § 328.3(c)(1)-(2)) and waters with a "significant nexus." *Id.* § 328.3(a)(8).

To begin, ambiguous standards for the presence of an OHWM like "changes in the character of soil" and "presence of litter and debris" will plainly invite arbitrary enforcement. But even if that were not enough, the Rule expressly allows agency staff to rely on whatever "other . . . means" they deem "appropriate" in deciding when an OHWM is present and where it lies. 33 C.F.R. 328.3(c)(6). In fact, "[t]here are no 'required' physical characteristics that must be present to make an OHWM determination." U.S. Army Corps of Eng'rs, *Regulatory Guidance Letter No. 05-05*, at 3 (Dec. 7, 2005). Regulators can reach any outcome they please, and regulated entities cannot know the outcome until they are already exposed to criminal liability, including crushing fines.

Matters are made worse by the methods prescribed for identifying an OHWM, which are standardless and cannot be replicated by the regulated public. Agency staff making an OHWM determination *do not even need to visit the site.* "Other evidence, besides direct field observation," can "establish" an OHWM. 80 Fed. Reg. at 37,076. The preamble warns that regulators may use, for example, desktop computer models "independently to infer" jurisdiction where "physical character-

istics" of bed and banks and OHWM "are *absent* in the field." *Id.* at 37,077 (emphasis added). That means not only that regulators won't need to visit a site, but that an OHWM will exist when they *say* it exists, even if it's not visible to the naked eye. Landowners will have to sleuth out the "prior existence" of an OHWM and "historical presence of tributaries"—with no limit to how far back they must go—based on unclear criteria such as "lake and stream gage data, flood predictions, historic records of water flow, and statistical evidence." *Id.* at 37,077-78.[2]

*Significant nexus.* The standardless discretion of the Rule is equally apparent with respect to the "case-by-case" significant nexus test. 80 Fed. Reg. at 37,058. At every stage, the test turns on subjective observations and opaque analyses.

Consider a landowner with a small, isolated pond on her property. To determine whether she needs a federal permit to discharge into the pond (for example, by building a swimming pier) the landowner must first identify all traditional navigable waters, interstate waters, and tributaries anywhere within 4,000 feet—*nearly a mile*—of the pond. Setting aside the vagueness of what counts as a "tributary" in the first place, imagine the landowner finds a tributary within the 4,000-foot limit. She must then sort out whether regulators will conclude that the pond, together with "other similarly situated waters in the region, significantly affects the chemical, physical, or biological integrity" of the nearest traditional navigable water or interstate feature. 33 C.F.R. 328.3(c)(5).

- Waters are "similarly situated" when "they function alike and are sufficiently close to function together in affecting downstream waters." 33 C.F.R. 328.3(c)(5). But when does a pond function "alike" with other ponds, and when does it function distinctly and alone? And what does "sufficiently close" mean? Is a mile too far? 10 miles? 100 miles?

- These "similarly situated" waters must "significantly affect[]" the "biological integrity" of the nearest traditional navigable water or interstate feature. 33 C.F.R. 328.3(c)(5). But what is "biological integrity," and when is an effect on water integrity *significant*? The agencies' explanation—that an effect is significant when it is "more than speculative or insubstantial"

---

[2]   Among the "remote sensing or mapping information" the agencies may rely on to detect an invisible OHWM from afar are "local stream maps," "aerial photographs," "light detection and ranging" (also known as LiDAR, which means topographic maps drawn by lasers mounted on drones), and other unidentified "desktop tools that provide for the hydrologic estimation of a discharge." 80 Fed. Reg. at 37,076-77. The agencies will use these sources "independently to infer" and "to reasonably conclude the presence" of an OHWM. *Id.* at 37,077.

(*id.*)—is no more clear than the nebulous word it purports to define.

- How are landowners expected to identify all "similarly situated" waters within hundreds of thousands of acres (requiring them to trespass on others' land), and then determine if they, together with the waters on their own land, "significantly affect" a tributary's water "integrity"?

These so-called standards fail to put the regulated community on notice of when the Clean Water Act actually applies to their lands.

    ***Categorical exemptions.*** Many of the rule's categorical exemptions from jurisdiction are also vague. For example, the agencies inserted an exemption for "puddles." 33 C.F.R. 328.3-(b)(4)(vii). But what is a puddle? The agencies assert jurisdiction over "depressional wetlands" (80 Fed. Reg. at 37,093), without regard for size or permanence. When does a recurring puddle become a small depressional wetland? For example:



**Figure 5:** Small "depressional wetland" or large puddle? AFBF Comments App. A at 38.

This is not a hypothetical concern. The Corps determined that the following feature is not a parking-lot puddle, but a jurisdictional *wetland*. According to common experience, it's a *puddle*:



**Figure 6:** Delineated "Water Feature 21" in Project SPK 2002-00641. *See* Staff of S. Comm. on Env't & Pub. Works, 114th Cong., *Expansion of Jurisdiction Claimed Under the Clean Water Act* 21 & n.87 (2016), perma.cc/W6U3-583Y.

Similar ambiguity arises with respect to the Rule's categorical exemption for "[e]rosional features, including gullies, rills, and other ephemeral features that do not meet the definition of tributary." 33 C.F.R. 328.3(b)(4)(vi). As we explained above, there is no way for the regulated public to know when the "volume, frequency, and duration of flow" of such erosional features is "sufficient to create a bed and banks and an ordinary high water mark" to qualify as a "tributary." *Id.* § 328.3(c)(3). The agencies' discretion in interpreting those provisions makes their applicability impossible to predict.

5.     *The WOTUS Rule violates the Commerce Clause*

The WOTUS Rule violates the Constitution in another way: The agencies have pushed their jurisdiction beyond its Commerce Clause limits. The Supreme Court has read the Commerce Clause "to mean that Congress may regulate 'the channels of interstate commerce,' 'persons or things in interstate commerce,' and 'those activities that substantially affect interstate commerce.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting *United States v. Morrison*, 529 U.S. 598, 609 (2000)). The Rule sweeps in countless land features that are not channels of, and have

no substantial effect on, interstate commerce.

No one could seriously say that channels of interstate commerce include an ephemeral trickle that happens to cross a state line, a dry wash in a Western desert, or an isolated wetland that is 4,000 feet from the nearest intermittent tributary that is itself miles away from any truly navigable water. Nor could anyone say that such features "'substantially affect[]' interstate commerce." *United States v. Lopez*, 514 U.S. 549, 559 (1995). On this score, even the agencies equivocate, asserting without citation that waters covered by the Rule "*could affect* interstate or foreign commerce." 80 Fed. Reg. at 37,084 (emphasis added). *Could affect* is a far cry from *substantially do affect*.

The WOTUS Rule additionally implicates the balance of power between the Federal Government and the States. The CWA reflects traditional views of the division of regulatory authority over waters. Navigable waters of the United States, which are part of or connected to channels of interstate commerce, are regulated by the Federal Government. At the same time, Congress "recognize[d]" and sought to "preserve[] and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, [and] to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b). The WOTUS Rule's sweeping assertion of federal jurisdiction upsets this balance between state and federal authority without any warrant in the text or history of the CWA, and in direct contradiction of 33 U.S.C. § 1251(b).

Given the judiciary's "particular duty to ensure that the federal-state balance is not destroyed" with respect to "traditional concern[s] of the States" (*Lopez*, 514 U.S. at 580-81 (Kennedy, J., concurring)), no court should countenance the agencies' assault on local jurisdiction over land use. Regulation of "development and use" of "land and water resources" is a "quintessential state and local power" preserved by the CWA. *Rapanos*, 547 U.S. at 737-38 (plurality); 33 U.S.C. § 1251(b). The Rule's dramatic encroachment on state authority violates the federalism principles embodied in the Constitution and the text of the CWA itself.

### B. The WOTUS Rule was promulgated in violation of the law

As though the substantive flaws with the WOTUS Rule were not enough, there are also

numerous procedural flaws with the WOTUS Rule.

               1.     *EPA's advocacy campaigns were unlawful*

Notice-and-comment serves three purposes. "First, notice improves the quality of agency rulemaking by ensuring that agency regulations will be 'tested by exposure to diverse public comment.'" *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983). "Second, notice and the opportunity to be heard are an essential component of 'fairness to affected parties.'" *Id.*; *accord Dismas Charities, Inc. v. DOJ*, 401 F.3d 666, 678 (6th Cir. 2005). "Third, by giving affected parties an opportunity to develop evidence in the record to support their objections to a rule, notice enhances the quality of judicial review." *Small Refiner*, 705 F.2d at 547.

The agencies gamed the APA at every turn in promulgating the WOTUS Rule: they made substantial changes to the rule between publication of the proposed rule and promulgation of the final rule—including by means of introducing critically important distance criteria—without reopening the comment period; and they withheld the final version of the central scientific report until after the comment period closed, denying the public any opportunity to comment on it or its relevance to the proposed rule. Those are fatal procedural flaws. But that is not all: The agencies also engaged in a lobbying campaign in support of the Rule and a propaganda campaign against its critics. In this way, EPA violated federal anti-lobbying and anti-propaganda laws and the basic principles of administrative rulemaking.

**a.** The Appropriations Act of 2014, Pub. L. No. 113-76, 128 Stat. 5, which authorized funding for EPA during the relevant time, prohibits use of appropriations "for publicity or propaganda purposes." *Id.*, tit. 7, § 718; *accord* Consolidated and Furthering Continuing Appropriations Act, Pub. L. No. 113-235, tit. 7, § 718, 128 Stat. 2130, 2383 (2014).

EPA's social media campaign violated this law. The General Accountability Office (GAO) has repeatedly held that "materials . . . prepared by an agency . . . and circulated as the ostensible position of parties outside the agency amount to [prohibited] covert propaganda." B-305368, 2005 WL 2416671, at *5 (Comp. Gen. Sept. 30, 2005). Yet EPA used Thunderclap (a "crowdspeaking"

platform) to recruit supporters of the proposed Rule and disseminate a misleading message. B-326944, 2015 WL 8618591, at *2 (Comp. Gen. Dec. 14, 2015); *see* perma.cc/9CHN-87T8 (archived Thunderclap page). The message, to an audience of 1.8 million, read: "Clean water is important to me. I support EPA's efforts to protect it for my health, my family, and my community." B-305368, 2005 WL 2416671, at *3. The statement concluded with a hyperlink to EPA's webpage promoting the proposed Rule. *Id.* Nothing identified EPA as the author; to anyone reading the message, "it appeared that their friend independently shared a message of his or her support for EPA and clean water." *Id.* at *8.

According to the GAO, this is the very definition of covert propaganda. EPA "used supporters as conduits of an EPA message . . . intend[ing] to reach a much broader audience," without disclosing "that the message was prepared and disseminated by EPA." B-326944, 2015 WL 8618591, at *8. This sort of surreptitious messaging is "beyond the range of acceptable agency public information activities," "reasonably constitute[s] 'propaganda,'" and was accordingly unlawful. B-223098, 1986 WL 64325, at *1 (Comp. Gen. Oct. 10, 1986).

**b.** According to the GAO, EPA also violated the anti-lobbying laws. Anti-lobbying provisions in appropriations statutes prohibit executive agencies from using appropriated funds "for the preparation" of materials "designed to support or defeat legislation pending before the Congress, except in presentation to the Congress itself." Pub. L. No. 113-235, tit. 7, § 715, 128 Stat. 2130, 2382-83. GAO has long held that these provisions prohibit an agency from engaging in "grassroots lobbying" by appealing "to the public to contact Members of Congress in support of, or in opposition to, pending legislation" that the agency supports or opposes. B-326944, 2015 WL 8618591, at *12.

That is exactly what EPA did. Its blog post discussing the importance of clean water to surfers and brewers linked to two external webpages that the GAO concluded made a "clear appeal" to the public to contact members of Congress to oppose pending legislation that would have blocked the Rule. B-326944, 2015 WL 8618591, at *15. It was not a close call: after encouraging readers to

24

"[u]rge your senators to defend Clean Water Act safeguards for critical streams and wetlands," the pages presented form letters for visitors to submit electronically to their senators. *See* perma.cc/-MB6B-QFCF (form letter page). By linking to these external websites, "EPA associated itself with the messages conveyed by these self-described action groups." B-326944, 2015 WL 8618591, at *18. In doing so, EPA directed the public to engage in lobbying activities against efforts to block the Rule, and thereby engaged in illegal "grassroots lobbying."

In light of EPA's unlawful propaganda and lobbying campaigns, there can be no doubt that the Rule was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The regulated community were entitled by law to be "treated with fairness and transparency," and the APA required the agencies to give their criticisms "due consideration." *Iowa League of Cities v. EPA*, 711 F.3d 844, 871 (2013). They were denied that.

### 2. *The agencies failed to comply with the Regulatory Flexibility Act*

**a.**   The RFA requires an agency to perform a "regulatory flexibility analysis" that estimates the full impact of any proposed rule on small entities and determines whether less burdensome alternatives are available. 5 U.S.C. § 603(a). The agency must summarize an initial analysis in the *Federal Register* at the time the rule is proposed (*id.* § 603(a)) and publish a final analysis, taking account of public comments, with the final rule. *Id.* § 604(a). These procedures are mandatory unless the agency certifies that the rule will not "have a significant economic impact upon a substantial number of small entities." *Id.* § 610(a).

Despite clear indications that the Rule would impose widespread hardship on small businesses and small governmental entities (*see* SBA Letter 4, ID-7958), the agencies certified in the preamble to the proposed Rule that the Rule would *not* "have a significant economic impact on a substantial number of small entities." 79 Fed. Reg. 22,188, 22,220 (Apr. 21, 2014). That certification was premised on the absurd claim that the Rule *narrows* the agencies' jurisdiction under the CWA. 80 Fed. Reg. at 37,102. The analysis supporting that conclusion is deeply flawed.

Public commenters explained that the agencies' RFA certification was wrong, and that the

Rule would require small businesses and municipalities across the country to obtain countless new and costly CWA permits, forcing many to "forgo . . . development plans." Nat'l Fed'n of Indep. Bus. Comments 7, ID-8319. The Small Business Administration—an independent federal agency created by Congress to assist and protect the interests of small business concerns—submitted similar comments urging the agencies to withdraw their certification. *See* SBA Comments 1.

But for purposes of their RFA certification, the agencies ignored these facts. Rather than basing their analysis on "the best [possible] assessment of the way the world would look absent the [Rule]" (OMB, *Circular A-4*, perma.cc/Q335-NPYA), the agencies instead based their conclusion that "the rule will not have a significant economic impact on a substantial number of small entities" on an assertion that "fewer waters will be subject to the CWA under the rule" as compared with "historic practice." 80 Fed. Reg. at 37,101-02. But the "historic practice" that the agencies selected was not the post-*Rapanos* guidance issued in 2008; it was instead the practice *before that*, which has since been superseded. *See* EPA, *2008 Rapanos Guidance and Related Documents*, perma.cc/6ZPF-PPME.

In support of that obviously mistaken approach, the agencies offered no explanation beyond the bald conclusion the 1986 practices "represent [an] appropriate baseline for comparison." 80 Fed. Reg. at 37,101. Not only is that wrong as a matter of common sense, but a "conclusory statement with no evidentiary support in the record does not prove compliance with the Regulatory Flexibility Act." *Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin.*, 919 F.2d 1148, 1157 (6th Cir. 1990); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency conclusions must be supported by reasoning and evidence).

The consequences of these oversights are not academic. The agencies have conceded that the Rule would result in a 2.84 to 4.65 percent *expansion* of jurisdiction when "[c]ompared to a baseline of recent practice." 80 Fed. Reg. at 37,101. And (using underinclusive estimates) they acknowledged that, as a result of the Rule, CWA permitting costs would increase by tens of millions of dollars, and mitigation costs by potentially over one hundred million dollars, throughout the nation each year.

*Economic Analysis of Proposed Revised Definition of Waters of the United States* 13-18, ID-0003; *Economic Analysis of the EPA-Army Clean Water Rule* x-xi, ID-20866. Common sense and common experience suggest that the true numbers are far larger.

## III. VACATUR OF THE APPLICABILITY DATE RULE WOULD BE INEQUITABLE

The APA does not require this Court to turn a blind eye to the unlawfulness of the WOTUS Rule. "[I]t is simply not the law" that courts must vacate every agency action found to violate the APA. *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002). The remedy of remand without vacatur allows agencies to correct deficiencies while leaving challenged regulations in place. *E.g.*, *NRDC v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015) ("[W]hen equity demands, [a] regulation can be left in place while the agency follows the necessary procedures."). Whether to enter this kind of remedy is a matter of the Court's equitable discretion. *Id.* Indeed, a court "may exercise equitable powers in its choice of a remedy, as long as the court remains within the bounds of statute and does not intrude into the administrative province." *Sharon Steel Corp. v. EPA*, 597 F.2d 377, 381 (3d Cir. 1979); *see also Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). Thus, remand without vacatur has been approved and employed by numerous federal circuits, including the Second Circuit.[3]

Remand without vacatur is particularly appropriate when the "consequences of vacating may be quite disruptive." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Ultimately, "resolution of the question turns on the Court's assessment of the overall equities." *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C.

---

[3]   *E.g.*, *NRDC*, 808 F.3d at 584; *Cent. Me. Power Co. v. Fed. Energy Regulatory Comm'n*, 252 F.3d 34, 48 (1st Cir. 2001) (whether to vacate "rests in the sound discretion of the reviewing court"); *Nat'l Org. of Veterans Advocates, Inc., v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1381 (Fed. Cir. 2001) ("The 'disruptive consequences' of vacatur in this case lead us to conclude that the better course is to remand without vacating."); *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (remanding without vacatur where "EPA may well be able to justify its decision . . . and it would be disruptive" to the regulated industry to vacate); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[A] regulation can be left in place while the agency follows the necessary procedures."); *Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284, 309-10 (3d Cir. 1977) (remanding regulation without vacatur).

2015). The particular inquiry "will, of course, vary with context, but the starting point is the same," according to which the court "must weigh (1) 'the seriousness of the order's deficiencies'" and "(2) 'the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Allied-Signal*, 988 F.2d at 150-51).

Here, those dual considerations strongly favor remand without vacatur: For the same equitable reasons that the Sixth Circuit entered a nationwide stay and the courts in Georgia and North Dakota entered preliminary injunctions, the Court should exercise its discretion to remand without vacatur if it finds the Applicability Date Rule must be reconsidered. To do otherwise—to allow to come into effect a rule that has been stayed nearly since its inception because it is "overwhelmingly" likely to be held unlawful in its own right—would not be equitable.

### A. The alleged procedural defects in the Applicability Date Rule can be cured on remand

In assessing the seriousness of a regulation's deficiencies, courts consider whether it is possible for the agency to resolve the deficiencies of the challenged rule on remand. *Allied-Signal*, 988 F.2d at 151. Particularly when the purported deficiencies relate to procedural violations rather than the merits of the agency's final decision—as they do here—courts avoid "dictat[ing] a substantive outcome based on a procedural error." *Shands*, 139 F. Supp. 3d at 270.

In these cases, Plaintiffs' challenge to the Applicability Date Rule is principally procedural. They argue that the agencies should have considered the merits of the WOTUS Rule before deciding to delay its application and that the agencies did not provide an adequate opportunity for meaningful public comment. Both of arguments, even if credited as true, can be cured on remand, and it is certainly "conceivable" (*Allied-Signal*, 988 F.2d at 151) that the agencies, after correcting these alleged errors, could reach the same substantive result.

That is especially so because, as we explained above, three courts and five federal judges have now uniformly concluded that the WOTUS Rule is likely unlawful. As the Southern District of Georgia most recently put it, the challengers before that court "overwhelmingly" demonstrated a

28

substantial likelihood of success on the merits that the WOTUS Rule violates both the CWA and APA. *Georgia*, 2018 WL 2766877, at *9. In particular, the WOTUS Rule is "plague[d]" by the "same fatal defect" that doomed prior EPA regulations because it reaches drains, ditches, and streams "remote from any navigable-in-fact" water. *Id*. at *4-*5 (quoting *Rapanos v. United States*, 547 U.S. 715, 781 (2006) (Kennedy, J., concurring in the judgment)); *id*. at *5 (the Rule is unlawful because it asserts jurisdiction over "remote and intermittent waters" lacking a "nexus with any navigable-in-fact waters"). Against this background, adequately explaining the need for a delay in the application of the WOTUS Rule should not be difficult.

### B.   Vacatur of the Applicability Date Rule would be extremely disruptive, while declining to vacate would appropriately maintain the status quo

Regardless of even "clear" or serious legal flaws, courts have declined to vacate agency actions where the disruptive consequences are likely to follow. *Sugar Cane Growers*, 289 F.3d at 98 (listing cases where courts remanded without vacatur despite an agency's failure to follow notice-and-comment procedures). Here, the practical impact of vacatur would be to allow the WOTUS Rule to come into effect in the 26 States in which its application has not (yet) been enjoined. To call that a disruptive outcome would be an understatement.

**1.a.**   According to the U.S. Court of Appeals for the Sixth Circuit, allowing the WOTUS Rule to take effect would have a "pervasive nationwide impact . . . on state and federal regulation of the nation's waters." *In re EPA*, 803 F.3d at 806. Indeed, "the sheer breadth of the ripple effects caused by the Rule's definitional changes counsels strongly in favor of maintaining the status quo for the time being." *Id*. at 808. For that reason alone, the balance of the equities militates against vacatur. *See Black Warrior*, 781 F.3d at 1290-91 (balancing the equities in considering the disruptive consequences of vacatur); *see also Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (in determining whether to issue an equitable stay, courts weigh the risk of irreparable injury against the possibility of substantial harm to other interested parties).

In evaluating the disruptive consequences of vacatur, courts consider consequences to

industry, including potential suspension of industry activity, lost jobs, and other costs as "essential facts" that are "clearly relevant." *Black Warrior*, 781 F.3d at 1291. Those factors especially favor remand without vacatur in this case.

Consider some concrete examples. The question of whether ephemeral drainage ditches are regulated as "waters of the United States" under the WOTUS Rule has significant implications for the ability of mining and energy companies to utilize their property to extract resources that are essential to the American economy. See *Am. Farm Bureau Fed'n v. EPA*, No. 3:15-cv-165, Dkt. 61-1 at 6a-8a, 46a-49a (S.D. Tex. Feb. 7, 2018) (hereinafter "Texas Addendum"). Mining and oil companies will be limited in their ability to engage in important new extraction projects if the projects' legality is in doubt, and in certain cases, may be outright prevented from proceeding with projects. This will come at the cost not just of dollars, but of jobs. *See*, *e.g.*, *id.* at 143a-149a, Appendix Tabs 2-4. Several declarants in the Sixth Circuit litigation provided concrete examples of just these concerns. *E.g.*, *In re Clean Water Rule*, No. 15-3751, Dkt. 129-2 at 86a-104a, 138a-142a (6th Cir. Nov. 1, 2016) (hereinafter "Sixth Circuit Addendum").

The question of how drainage ditches, too, are treated has enormous implications for agricultural interests. If the WOTUS Rule came into effect, farmers and ranchers would have to take vast tracts of land out of use, keeping them free of farming equipment, dirt and gravel, seed, and fertilizer. *See* Sixth Circuit Addendum 9a-10a, 50a-53a; Texas Addendum Tab 4. Because of the enormous risk associated with liability under the CWA, many of them will either (1) leave their lands fallow for fear of incurring liability under vague regulations that may or may not be in effect at any given point in time over the coming years (Sixth Circuit Addendum at 9a-12a, 50a-53a, 74a-79a, 122a-124a, 127a-129a), or otherwise (2) seek unnecessary permits at a cost of tens of thousands of dollars (*id.* at 16a-19a, 82a-83a, 173a-175a).

Foresters face similarly untenable choices. *See* Sixth Circuit Addendum at 31a-32a, 56a-57a, 84a-85a. Indeed, these concerns cut across all aspects of nearly every industry in the country, including not only energy and agriculture, but also sustainable forest management, infrastructure and

transportation development, and homebuilding and construction. *Id*. at 61a-69a, 105a-106a, 135a-137a, 204a-208a.

The record contains other examples of injury from the Rule. For example, the Rule's dual classification of some "point sources" as "waters" would also impose tremendous costs on municipal bodies (and businesses) that must manage sewage, wastewater, and stormwater. In just one example, Pinellas County, Florida estimates that it and its co-permittees will be forced to spend between $430 million and $2.72 billion in remediation if their stormwater conveyances and drainage ditches are made jurisdictional. The Rule would require them—counterproductively—to divert substantial resources from the protection of critical waterbodies, including Tampa Bay and other crucial, environmentally rich inlets along the Gulf of Mexico. *See* Pinellas Cty. Comments 4, ID-14426. The Rule will thus distort local priorities and allocations of limited resources to the detriment of water quality protection. *See* Fla. Stormwater Ass'n Comments 8-14.

The Ninth Circuit's decision in *California Communities Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012) is instructive. In *California Communities*, the Ninth Circuit remanded an admittedly flawed EPA regulation in part because vacatur would halt construction on a billion-dollar venture. *Id*. at 993-94. Just as in *California Communities*, vacatur here would be "economically disastrous," and come at the price not just of dollars, but of jobs. *Id.* at 994. Here, the consequences would be on a greater scale than those faced in *California Communities*, which involved a single venture. The concerns here cut across all aspects of nearly every industry in the country, from energy and agriculture to infrastructure and transportation development to homebuilding and construction.

**b.**   It further counsels against vacatur that two district courts have entered preliminary injunctions against enforcement of the WOTUS Rule, but only on a *regional* basis. Important and consequential national regulations like the WOTUS Rule should not apply differently depending on the happenstance of location. Yet if the Court were to vacate the Applicability Date Rule, and the WOTUS Rule were allowed to come into effect, the regulated community would have to comply with an unlawful regulation in a muddled patchwork of States. This would compound the Business

Intervenors' injuries, requiring them to sort out which regulatory regime applies to which activities under which circumstances—a particularly troubling prospect given that their members manage construction, extraction, and farming projects across multiple states, creating conflicting permitting obligations. The WOTUS Rule, as well as the massive disruption its enforcement would cause, is national in scope. It should not be enforced in a piecemeal way.

    **c.**  In contrast to the harms faced by regulated parties from vacatur of the Applicability Date Rule, a remand without vacatur would not cause Plaintiffs or the public any injury; it would simply maintain the same decades-long status quo that the Sixth Circuit maintained with its nationwide stay. The WOTUS Rule was subject to a nationwide stay shortly after its inception, and the Applicability Date Rule, in practical effect, extends the stay. For the same reasons that the Sixth Circuit found a nationwide stay warranted and the courts in Georgia and North Dakota found preliminary injunctions warranted, the Court should remand without vacatur if it finds the Applicability Date Rule legally deficient in any way.

    Maintenance of the status quo is particularly important in light of regulatory developments since the Sixth Circuit's decision to enter a stay. The defendants have proposed a complicated, multi-stage regulatory process for repealing and replacing the WOTUS Rule. Various States and environmental groups have vowed to challenge this proposed regulatory process at every step—as this lawsuit itself demonstrates. Although we are confident that the agencies are pursuing sound and lawful objectives, there is no telling whether the district courts in which the challengers bring their forthcoming lawsuits will agree.

    The upshot is an even more unclear and uncertain regulatory environment than Business Intervenors faced in 2015, when the Sixth Circuit first entered the nationwide stay. If the Applicability Date Rule were vacated, the WOTUS Rule would come into effect in 26 States not subject to a court's preliminary injunction; it then may fall out of effect when the rule repealing the WOTUS Rule is finalized; it may then come back into effect if the Repeal Rule is invalidated (but, again, only in 26 States); it may then may fall out of effect when the Replacement Rule is finalized; and it then

may come back into effect if the Replacement Rule is invalidated (but, again, only in 26 States). This threat of a constantly flip-flopping and crazy-quilt regulatory environment with respect to a regulation of such fundamental importance is simply untenable.

**2.**   Anticipating all of this, the No. 1048 plaintiffs cite to *Guertin v. United States*, 743 F.3d 382 (2d Cir. 2014), for the unexplained proposition that vacatur is the "usual" remedy in successful APA challenges. *See* No. 1048 Pl. Br. 25. But the fuller context of the Second Circuit's statement supports our position, not theirs: The court said that, "*[i]n the usual case*, when an agency violates its obligations under the APA, we will vacate a judgment and remand to the agency to conduct further proceedings." *Guertin*, 743 F.3d at 388 (emphasis added). But that goes to the heart of our point: this is *not* a "usual" case.

In a typical APA case, vacatur *restores* the presumptively-valid status quo ante. Here, vacatur would accomplish the precise opposite: It would restore a sprawling and disruptive regulation that was stayed within six weeks of taking effect because (according to five different federal judges sitting on three different federal courts), it is "overwhelmingly" likely to be held unlawful in its own right. Allowing a regulation like that to take effect, to the exclusion of the status quo that prevailed for decades before its promulgation, would hardly be equitable. Given the severely problematic consequences that the WOTUS Rule would inflict, the Court should instead remand without vacatur if it concludes that the Applicability Date Rule should be reconsidered.

## CONCLUSION

Plaintiffs' motions for summary judgment should be denied and Defendants' cross-motions should be granted. Alternatively, the Court should remand without vacatur.

Dated: June 28, 2018     Respectfully submitted,

           */s/ Silvia Babikian Pacia*
           Silvia Babikian Pacia
           MAYER BROWN LLP
           1221 Avenue of the Americas
           New York, NY 10020
           Tel: (212) 506-2500
           Fax: (212) 262-1910
           spacia@mayerbrown.com

           Timothy S. Bishop*
           Michael B. Kimberly*
           MAYER BROWN LLP
           1999 K Street NW
           Washington, DC 20006
           Tel: (202) 263-3000
           Fax: (202) 263-3300
           tbishop@mayerbrown.com
           mkimberly@mayerbrown.com

           *admitted *pro hac vice*

           *Attorneys for Intervenors-Defendants*